**Joseph B. CARPENTER**

v.

**The COMMONWEALTH of Pennsylvania, PENNSYLVANIA LIQUOR CONTROL BOARD.**

Civ. A. No. 80–2777.

United States District Court, E. D. Pennsylvania.

Jan. 13, 1981.

Henry S. Perkin, Allentown, Pa., for plaintiff.

Patrick M. McHugh, Asst. Atty. Gen., Harrisburg, Pa., for defendant.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

The constitutional predicate of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq., eludes facile categorization under the Commerce Clause[1] or Section 5 of the Fourteenth Amendment.[2] Apparently Congress intended to invoke the former source as legislative authority when it declared that "existence in industries affecting commerce of arbitrary discrimination in employment because of age burdens commerce and the free flow of goods in commerce". 29 U.S.C. § 621(a)(4). This language also suggests that Congress intended to use its full authority under that clause. See Walling v. Jacksonville Paper Co., 317 U.S. 564, 570, 63 S.Ct. 332, 336, 87 L.Ed. 460 (1943) (the appropriate terminology for Congress to use when it intends to invoke the full authority of the Commerce Clause is "in any industry affecting commerce") and compare with 29 U.S.C. § 621(a)(4) (above). Compiled during debates relating to amendments to the ADEA in 1974, legislative reports stated that Congress intended to effect the purposes of the Act "through the exercise ... of its power to regulate commerce among the several states and with foreign nations". H.R.Rep. No. 93–913, 93d Cong., 2d Sess. (1974) (emphasis added). Similarly, a Senate report confirmed the legislators' belief that "the activities of public section employers affect interstate commerce and therefore that Congress may regulate them pursuant to its powers to regulate interstate commerce". S.Rep. S–543–3, 93d Cong., 2d Sess. (1974). Undoubtedly, in enacting the ADEA Congress considered the Commerce Clause as a source of legislative power. See Usery v. Manchester East

---

1. U.S.Const., art. I, § 8, cl. 3.

2. § 5 reads: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article".

*Catholic School Board*, 430 F.Supp. 188 (D.N.H.1977).

However, this conclusion does not preclude Congress' use of Section 5 as a separate and independent source of authority as well. Regrettably, the legislative history does not reveal a clear address to the issue, but speeches in both houses referred to justifying the proposed proscription against age discrimination in employment on bases similar to ones supporting the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See* 113 Cong.Rec. 34742 (December 4, 1967) and 113 Cong.Rec. 31255 (November 6, 1967). Resemblances between these two acts have prompted courts to interpret one act by resort to the other for clarification and assistance, *Smithers v. Bailar*, 629 F.2d 892 (3d Cir. 1980), *Davis v. Calgon Corp.*, 627 F.2d 674 (3d Cir. 1980), *Ricks v. Delaware State College*, 605 F.2d 710 (3d Cir. 1979) *cert. granted,* —— U.S. ——, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), *Rodriguez v. Taylor*, 569 F.2d 1231 (3d Cir. 1977), particularly in light of the acts' common interdiction of employment criteria based on age, race, color, religion and national origin. *Compare* 29 U.S.C. § 621(b) ("the purpose of this chapter [is] to prohibit age discrimination in employment") *with* 42 U.S.C. § 2000e–2 ("it shall be an unlawful employment practice for an employer ... to hire or to discharge any individual ... because of such individual's race, color, religion, sex or national origin"). *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) *and compare with Oscar Mayer Co. v. Evans*, 441 U.S. 756, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979) and *Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). Undoubtedly, Congress exercised its powers under Section 5 of the Fourteenth Amendment in enacting amendments to Title VII. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Similarly, Congress availed itself of the same authority in propounding the ADEA. *Arritt v. Grisell*, 567 F.2d 1267 (4th Cir. 1977). *Accord, Marshall v. Delaware River & Bay Authority*, 471 F.Supp. 886 (D.Del.1979), *Remmick v. Barnes County*,

435 F.Supp. 914 (D.N.Dak.1977), *Aaron v. Davis*, 424 F.Supp. 1238 (E.D.Ark.1976), *Usery v. Board of Education of Salt Lake City*, 421 F.Supp. 718 (D.Utah 1976).

 Exercise of Congressional authority under Section 5, unlike the Commerce Clause, is not limited by the Tenth Amendment. *Usery v. Allegheny County Institutional District*, 544 F.2d 148 (3d Cir. 1976). *Cf. National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (certain amendments in 1974 to Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, considered an unconstitutional exercise of Congress' power under the Commerce Clause because it impinged on states' freedom to implement their own governmental functions in violation of the Tenth Amendment). In contrast, in Section 5

> Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority. When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional amendment whose other sections by their own terms embody limitations on state authority .... Congress may, in determining what is "appropriate legislation" for the purposes of enforcing the provisions of the Fourteenth Amendment provide for private suits against States or state officials which are constitutionally impermissible in other contexts.

*Fitzpatrick v. Bitzer*, 427 U.S. at 456, 96 S.Ct. at 2671. *See also Mitchum v. Foster*, 407 U.S. 225, 239–41, 92 S.Ct. 2151, 2160–2161, 32 L.Ed.2d 705 (Civil War amendments established "the role of the Federal government as a guarantor of federal rights against state power ... Congress clearly conceived that it was altering the relationship between the states and the nation with respect to federally created rights"), *Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 1723, 16 L.Ed.2d 828 (1966) ("[c]orrectly viewed, § 5 is a positive grant of legislative power authorizing Con-

gress to exercise its discretion in determining whether and what legislation is needed to secure the guaranties of the Fourteenth Amendment"), *Ex parte Virginia*, 100 U.S. 339, 346, 25 L.Ed. 667 (1880) ("the prohibitions of the Fourteenth Amendment are directed to the States, and they are to a degree restrictions of state power. It is these which Congress is empowered to enforce against state action ... whether executive, legislative, or judicial"). True, allowing ADEA claims against states impinges upon the concept of federalism immanent in the truism of the Tenth Amendment,[3] but states' ratification of the Civil War Amendments sanctioned Congressional intervention into judicial, executive and legislative domains previously reserved inviolate to the states.[4] *Ex parte Virginia, supra.* In short, the Tenth Amendment does not bar application of the ADEA to a state agency.

In the case *sub judice*, an enforcement officer employed by defendant Pennsylvania Liquor Control Board instituted this

action to obtain reinstatement, damages and attorney's fees after defendant retired him pursuant to the agency's mandatory retirement policy. Defendant moved to dismiss the complaint and contended that this Court lacks subject-matter jurisdiction and that the complaint failed to state a claim upon which relief could be granted. Defendant argued that the Commerce Clause formed the constitutional foundation for the ADEA and that, therefore, the Tenth Amendment affirmatively limited that power with respect to state governmental functions. As noted above, however, Congress drew upon Section 5 of the Fourteenth Amendment in enacting the ADEA and, therefore, the Tenth Amendment does not circumscribe its operation. Accordingly, defendant's motion to dismiss will be denied.

---

**3.** The proper relationship between the federal and state governments received attention prior to enactment of the Tenth Amendment. Various delegates to the Federal constitutional convention expressed concern above the matter. George Mason (1725–1792), a delegate from Virginia, emphasized the importance of state governments, which he considered as necessary as the federal government. Luther Martin (c. 1748–1826), a delegate from Maryland and later its first attorney-general, agreed and urged "at great length and with great eagerness" support of state governments, even at the expense of the federal one, whose power, he claimed, should be kept within narrow limits. He warned that if too little power were given to the federal government, more might be added; but if too much, it could never be recovered. His fervor earned him the epithet "bulldog of federalism". *See* H. Adams, *John Randolph* (1882). *See* J. Madison, *Journal of the Federal Convention*, 251 (Scott ed. 1895), and 3 *Documentary History of the Constitution of the United States*, 1786–1870 (1900), 65, 76, 88, 240, and 261–64.

Interestingly, Mason refused to sign the Constitution because it had no bill of rights. *See* R. Rutland, *George Mason, Reluctant Statesman* (1961). Madison himself viewed the state and federal governments as "but different agents and trustees of the people, constituted with different powers, and designed for different purposes". *The Federalist*, No. 46.

**4.** See the remarks of Senator Jacob Howard (1805–1871) of Michigan in *The Congressional Globe*, 2768 (May 23, 1866) ("[§5] gives to Congress power to enforce by appropriate legislation the provisions of [the Fourteenth Amendment]. Without this clause, no power is granted to Congress by the amendment or any one of its sections. It casts upon Congress the responsibility of seeing to it, for the future, that all the sections of the amendment are carried out in good faith, and that no state infringes the rights of persons or property. I look upon this clause as indispensable for the reason that it thus imposes upon Congress this power and duty").

Senator John Pool (1826–1884) of North Carolina, debating the proposed Enforcement Act of 1870, now 18 U.S.C. § 241, commented that "the United States Government has the right to go into the states and enforce the Fourteenth and Fifteenth Amendments, [and this] is, in my judgment, perfectly clear, by appropriate legislation that shall bear upon individuals. I believe that the United States has the right and that it is an incumbent duty upon it, to go into states to enforce the right of the citizens against all who attempt to infringe upon those rights when they are recognized and secured by the Constitution .. [T]he rights ... could not be and cannot be safely left to the mere caprice of the states". 41st Cong., 2d Sess. (1870).