**U. S. EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION, Plaintiff,**

v.

**CITY OF MINNEAPOLIS and
Minneapolis Police Relief
Association, Defendants.**

Civ. No. 4–81–660.

United States District Court,
D. Minnesota,
Fourth Division.

April 16, 1982.

Sandra A. Neese, Regional Atty., Thomas Nelson, Supervisory Trial Atty., Isaias Ortiz, Lloyd Zimmerman, Senior Trial Attys., U. S. Equal Employment Opportunity Commission, Milwaukee Dist. Office, Milwaukee, Wis., for plaintiff.

Robert Alfton, City Atty., Steven Fredrickson, Mary M. Wahlstrand, Asst. City Attys., Minneapolis, Minn., for defendant City of Minneapolis.

Roger A. Peterson, Richard L. Kaspari, Jay Y. Benanav, Peterson, Engberg & Peterson, Minneapolis, Minn., for defendant Minneapolis Police Relief Assn.

MacLAUGHLIN, District Judge.

This is an action brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, challenging certain mandatory retirement requirements for police captains employed by the City of Minneapolis. On October 20, 1981, this Court issued an order temporarily enjoining the forced retirement of Captain David H. Anschutz of the Minneapolis Police Department. By agreement of the parties, the Order has remained in effect until the issuance of this Memorandum and Order. Pursuant to Federal Rule of Civil Procedure 65(a)(2), the Court ordered consolidation of the trial on the merits with the hearing on the application for a preliminary injunction. The following memorandum constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

FACTS

The plaintiff herein is the Equal Employment Opportunity Commission (EEOC), an agency of the United States Government charged with administration and enforcement of the ADEA. The EEOC commenced this action on behalf of "charging party" David H. Anschutz. Anschutz is a captain of the Minneapolis Police Department. He was born on October 20, 1916, and reached age 65 on October 20, 1981.

Defendant City of Minneapolis is a political subdivision of the State of Minnesota. It maintains a law enforcement agency consisting of over 700 persons. Defendant Minneapolis Police Relief Association (MPRA) is a quasi-governmental corporation responsible for the administration of pensions for Minneapolis police. The MPRA is an instrumentality of the State of Minnesota and is an employer within the meaning of the ADEA, 29 U.S.C. § 630(b).

Pursuant to state statutes, the defendants require that all Minneapolis police officers retire upon reaching age 65. The state laws in question are codified as Minn.Stat. §§ 423.075 and 423.755. Section 423.075, Subd. 1 (1981), provides in pertinent part:

Every employee, officer, or person on the payroll of any fire or police department in any city of the first class who is designated as a future beneficiary by the rules of any tax aided pension, relief, or retirement fund established and maintained by authority of laws of this state, shall retire upon reaching the age of 65 years[.]

Section 423.755 provides in pertinent part:

... [S]ubject only to the provisions of section 423.075, a member shall retire upon reaching the age of 65, and upon attaining the age of 65 shall cease to be an active member of the association. Any member who knowingly fails or

refuses to comply with this section thereby renders himself, his widow and children ineligible for any benefits provided under section 423.755, subdivision 1, and section 421.75. Any person who has ceased to be an active member of the association or has knowingly failed or refused to retire, shall be eligible only for the refund provided for in section 423.-755, subdivision 2.

Minneapolis is a city of the first class within the meaning of section 423.075, subdivision 1, and participates in the pension program referenced in section 423.755 through the MPRA. Unless restrained by this Court, the defendants would have enforced the mandatory retirement provisions of these state laws against Captain Anschutz on October 20, 1981.

The Minneapolis Police Department is an agency of the City of Minneapolis responsible for providing law enforcement and emergency services to the city. It has 714 sworn officers and 93 non-sworn employees. Members of the Department are either in the classified service, which is regulated by the civil service laws, or the unclassified service, which is not regulated by civil service laws. The department is structured in a pyramidal chain of command, the higher ranks of which are in the unclassified service. The ranks in the unclassified service are chief of police, deputy chief of police, inspector of police, and supervisors of the internal affairs unit, the morals and narcotics section, and of license inspections. The ranks in the classified service are captain, detective supervisor, lieutenant, sergeant and police officer.

*Current Duties of Police Captains*

The rank of captain is the highest position in the Minneapolis Police Department subject to civil service regulations and procedures. The minimum qualifications required to take the civil service examination for the rank of captain are graduation from high school or the equivalent, and two years experience as a police lieutenant or four years experience as a detective. Also required are a thorough knowledge of laws, ordinances and regulations applicable to police work, a thorough knowledge of the principles and techniques of police work and traffic control, the ability to supervise, lead and instruct subordinates, ability to maintain good relations with the public and within the department, ability to make clear and accurate reports. No medical exam or physical fitness test is required of candidates for the position of captain.

The Minneapolis Police Department currently employs 16 captains. The department is divided into three bureaus, with each bureau subdivided into divisions. Each captain is responsible for the operation of a particular division. Five of the 16 captains are involved in command of divisions in the patrol bureau of the department. Of these five, four are engaged in the command of Minneapolis' four precinct houses, and the fifth commands the street crimes division. Six captains are in charge of divisions in the investigative bureau of the department. Captain Anschutz currently commands one of the investigative divisions, the forgery and fraud division. The remaining five captains are in charge of divisions in the service bureau or hold other administrative posts. The duties of captains vary somewhat depending on the characteristics of the precinct or division. In the past, captains have been transferred to different precincts or divisions every two or three years. The purpose of the frequent rotation among posts is to provide each captain with a broad range of experience, thereby improving leadership capacity. The department exercises considerable discretion in deciding which captain to assign to a particular post and when to make assignments. In at least one instance, a captain remained in the same post for approximately eight years.

In general, a captain's duties involve the management and supervision of a division of the department. Each captain commands a number of police officers of the rank of lieutenant and below, and supervises the day to day activities of those subordinates. A captain's job is primarily that of a manager and executive. A captain oversees and coordinates the utilization of law

enforcement resources within a division. The duties involve establishing policies and rules for the division, planning and coordinating activities of assigned personnel, handling disciplinary actions, supervising the training of subordinates, maintaining effective communications with community groups and the public in general, and supervising the preparation, maintenance and presentation of records, budgets and inventory. A captain's duties also involve some command presence in the field during "street situations" such as barricaded suspects, hostage negotiations, crowd control at local events, or natural disasters. Captains in the patrol bureau tend to encounter more street situations than captains in the investigative or service bureaus.

The amount of time a captain must spend in responding to field emergencies is not great. Captain John Jensen, commander of a precinct house, testified that he is more active in field operations than most captains and that field work constitutes about five percent of his job. From January 1, 1979, to November 6, 1981, captains of the Minneapolis Police Department participated in approximately .2 of one percent of the arrests made by Minneapolis police officers.[1] At the scene of a street situation, other officers will nearly always be present. A captain will generally be the highest or among the highest ranking officers at the scene. Therefore, a captain's role in street situations normally involves directing and coordinating the work of other officers at the scene. A captain must exercise judgment in making decisions on how to respond to threats to public safety, including such decisions as whether to use force to bring a situation under control, how much force to use, and the timing of the use of force. Although the evidence established that captains infrequently participate in front line duties, the infrequent situations nevertheless may involve considerable danger and responsibility for the lives of fellow officers and the public.

In addition to the duties of the position, police captains are sworn officers who perform general law enforcement duties. A sworn officer who encounters a crime in progress must respond, whether on or off duty. Situations where a captain encounters a crime in progress arise infrequently, but when they arise the captain may be required to use a firearm and apprehend a suspect.

### Prospective Duties of Police Captains

In the Minneapolis Police Department, there are three ranks above the rank of captain. At the top is the chief of police. The chief is nominated by the mayor, is approved by the city council, and serves a three year term. The current chief, Anthony V. Bouza, was appointed February 11, 1980, for a term that will expire on December 31, 1982. Immediately below the chief in the chain of command are three deputy chiefs, who are appointed by the chief of police. Immediately below the deputy chiefs and above the captains is the rank of inspector. The inspector position was created by state law in approximately 1945. There are currently five inspectors. They are appointed by the chief of police and are not subject to civil service regulations or procedures.

The inspector position involves predominately street patrol work. At least one inspector is on duty at all times. Inspectors patrol the streets of Minneapolis in an unmarked squad car while monitoring crime reports on two channels of the police radio. Inspectors have discretion as to which calls to respond to, but are expected to respond to all major crime calls from anywhere in the city. Occasionally, an inspector will be the first officer to arrive at a major crime scene, but normally more officers will be

1. Plaintiff's Exhibit 9 shows that from January 1, 1979, to November 6, 1981, Minneapolis police officers made approximately 24,000 arrests. Seven of the 16 captains were involved in no arrests and did not participate at arrest scenes during that period. As a group, the police captains were involved in 50 to 55 arrests, primarily in the capacity of assisting other officers who actually made the arrests. The captain in charge of the vice and narcotics division was the most active, accounting for 20 of the arrests in which the captains were involved.

present. As the highest ranking officer at the scene, the inspector's job is to direct and coordinate the activities of all the other officers at the scene.

Chief Bouza testified that he intends to eliminate all five inspector positions during the next three years. The phase-out is expected to begin on May 1, 1982, when one of the current inspectors is expected to take an early retirement. Chief Bouza's plan involves the assumption by the captains of duties currently performed by inspectors. Because the inspector position involves dramatically more front-line work than the current captain position, the assumption of inspector duties by captains will involve a significant change in the captain position. Moreover, the anticipated change may require some or all of the captains to work nights and weekends, which captains currently are not required to do.

At the time of this trial, the phase-out of the inspector position was in an anticipatory or planning stage. None of the five inspectors has yet vacated a position. No clear plans have been formulated for how the duties of the five inspectors are to be allocated among the 16 captains. It has not been determined whether five captains will assume the inspectors' duties, whether all 16 captains will acquire a share of the duties, or whether some other plan will be formulated. It is unclear whether other officers, such as lieutenants, might be able to assume some of the duties of the inspectors. Moreover, given the vagaries of the budgetary and political processes, it is not certain that Chief Bouza will be able to implement his plan. Thus, the impact of the proposal to transfer the duties of inspector to captains is speculative at this time.

*Effects of Aging on the Ability to Perform*

Prior to Captain Anschutz' challenge to the mandatory retirement policy, the Minneapolis Police Department had not conducted any studies to determine whether work performance is affected by age. Police officers on the Minneapolis Police Department are not required to pass any type of medical or physical fitness test on a routine, periodic basis. The Minneapolis Police Department has a system of performance evaluation whereby each officer's superior annually completes a checklist indicating whether or not the officer has met or exceeded department standards for job performance. In 1981 Captain Anschutz met all the standards indicated on the checklist.

The Minneapolis Police Department has employed police officers who have worked past their 65th birthday. The last such individual retired in 1948. The mandatory retirement age for police officers varies among the major metropolitan areas of the United States. Several large urban areas such as Tucson, Cincinnati, Philadelphia, Honolulu, and St. Paul do not require police officers to retire before age 70. Other large urban areas, such as New York City, Baltimore, Washington, D.C., and Chicago require police officers to retire before reaching age 65.

The aging process affects all human beings and cannot be avoided. It manifests itself in virtually all physical and mental aspects of the human body. As a person ages, many physiological changes occur. Visual perception decreases. Older persons experience difficulty in color discrimination, depth perception, the ability to adapt to darkness, the ability to focus, and have reduced depth perception. Auditory perception also declines with age. Cognitive functions are adversely affected with advancing age due to structural and chemical changes that occur in the neuroendocrinal and central nervous systems. Some loss of memory, particularly short term memory, is common with advancing age.

In addition to these effects on a person's sensory and cognitive abilities, aging also affects physical motor skills. Strength declines because of a decrease in muscle mass that accompanies aging. Speed and agility decline with age due to stiffening of the joints. Stamina and endurance decline with age. Aging also results in decreased ability to maintain homeostatic balance, such as in a decline in the body's ability to adjust to temperature changes. Moreover, health problems affect a substantial num-

ber of persons over the age of 65. About 10 to 15 percent of all 65 year olds show soft signs of some form of dementia, such as Alzheimer's disease.

There is a synergistic effect associated with aging. As one function deteriorates, a person tends to rely more heavily on other functions. For example, a person may rely more heavily on vision to compensate for a hearing loss. Since the relied on function may also be deteriorating with age, the total effect of the aging process may be greater than the sum of its parts.

Despite these general effects of aging on the human body, individuals vary greatly in the way they are affected by age. Many individuals in their sixties or seventies can physically outperform persons in their twenties. Lifestyle factors such as regular exercise, refraining from smoking, and eating a balanced diet have a substantial effect on the functional capacity of persons as they age. Moreover, the changes that accompany age occur on a continuum, and some of the changes are significant in many individuals by age 50, while others may become significant much later. All the experts who testified at trial agreed that age 65 is not a magical age on the continuum and that one could not predict how well an individual would perform in a given occupation simply by knowing the individual's age.

Evidence presented by the defendants demonstrated that the ability to handle certain aspects of general police work cannot be reliably tested. It is scientifically and ethically impossible to duplicate for testing purposes a high stress situation, such as an encounter with an armed suspect, that police officers may experience in the field. It is therefore impossible to test the physical and mental ability of an officer to satisfactorily resolve such situations, regardless of age or rank.

However, there are multiple methods of reliably evaluating the primary aspects of the job performance of police captains. Periodic use of thorough medical and psychological examinations or physical fitness tests for all police department personnel could weed out incompetent or unfit officers of any age. Performance evaluations and daily observations by peers and supervisors can be an important and valuable basis for assessing occupational fitness.

DISCUSSION

The ADEA prohibits discrimination of employment of persons between the ages of 40 and 70. 29 U.S.C. §§ 623 and 631. Section 623(f)(1) permits an exception to the general prohibition of discrimination. It provides:

It shall not be unlawful for an employer ... to take any action otherwise prohibited under [the ADEA] where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business[.]

The defendants have admitted that their sole reason for requiring Captain Anschutz to retire at age 65 was his age. The defendants have not claimed that their intended discharge of Captain Anschutz at age 65 was based on "good cause," 29 U.S.C. § 623(f)(3), or on "reasonable factors other than age." 29 U.S.C. § 623(f)(1). Consequently, the issue for decision in this case is whether the defendants' policy that police captains must be 64 years of age or less is a bona fide occupational qualification (BFOQ) reasonably necessary to the normal operation of the Minneapolis Police Department. In addition to the BFOQ exemption, the defendants claim that the ADEA is unconstitutional as applied to states and municipalities.

1. *Constitutionality of the ADEA*

Congress amended the ADEA in 1974 to extend its prohibitions against age discrimination, previously applicable only to private employees, to the states and their instrumentalities. 29 U.S.C. § 630(b). The defendants contend that the application of the ADEA to state and local governments and their instrumentalities interferes with rights reserved to the states under the tenth amendment of the United States Constitution. They rely on *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). Two courts recently held that the tenth amendment prohibits

application of the ADEA to state and local governments. *Taylor v. Department of Fish and Game*, 523 F.Supp. 514 (D.Mont. 1981); *EEOC v. Wyoming*, 514 F.Supp. 595 (D.Wyo.1981), *prob. juris. noted*, —— U.S. ——, 102 S.Ct. 996, 71 L.Ed.2d 291 (1982).

Most courts that have considered the issue, however, have held that the ADEA may constitutionally be applied to state and local governments. *E.g., EEOC v. Elrod*, 674 F.2d 601 (7th Cir. 1982); *Arritt v. Grisell*, 567 F.2d 1267 (4th Cir. 1977); *EEOC v. County of Calumet*, 519 F.Supp. 195 (E.D. Wis.1981), *appeal docketed*, No. 81–2120 (7th Cir. 1981); *Carpenter v. Pennsylvania Liquor Control Board*, 508 F.Supp. 148 (E.D. Pa.1981); *Aaron v. Davis*, 424 F.Supp. 1238 (E.D.Ark.1976). The decisions have relied on Congress' power under either the fourteenth amendment or the commerce clause, or both, to uphold the constitutionality of extending coverage of the ADEA to state and local governments.

■ The issue is now before the United States Supreme Court, which recently noted probable jurisdiction in *EEOC v. Wyoming*. Because of the impending decision by the Supreme Court, this Court will not extensively discuss the issue. Suffice it to say that this Court believes that the decisions upholding the constitutionality of applying the ADEA to state and local governments are persuasive and that the United States Supreme Court will rule consistently with these decisions. Accordingly, the Court holds that the extension of the ADEA to state and local governments was a constitutional exercise of Congress' powers.[2]

2. *The BFOQ Defense*

■ The defendants' admission that Captain Anschutz was to be forced to retire upon reaching age 65 constitutes a *per se* violation of the ADEA. *EEOC v. City of St. Paul*, 671 F.2d 1162, 1166 (8th Cir.

1982); *Houghton v. McDonnell Douglas Corp.*, 553 F.2d 561, 564 (8th Cir.), *cert. denied*, 434 U.S. 966, 98 S.Ct. 506, 54 L.Ed.2d 451 (1977). The defendants have raised as a defense the BFOQ exemption, and they must carry the burden of proving that their actions are justified by a BFOQ. *City of St.Paul*, 671 F.2d at 1166; *McDonnell Douglas*, 553 F.2d at 564. "This burden requires the employer to show that either it has a factual basis for believing that substantially all of the older employees are unable to perform their duties safely and efficiently or that some older employees possess traits precluding safe and efficient job performance unascertainable other than through knowledge of the employee's age." *City of St. Paul*, at 1166.

■ The initial inquiry for the Court is in determining the relevant class to which the BFOQ may apply. In *City of St. Paul*, the Eighth Circuit rejected the expansive approach for determining the relevant class utilized by the Seventh Circuit in *EEOC v. City of Janesville*, 630 F.2d 1254 (7th Cir. 1980). The Eighth Circuit held that there may be many occupations within a particular business, and the BFOQ exemption must be considered with respect to the specific occupation in question. *City of St. Paul*, 671 F.2d at 1165–1166. In this case the occupation to which the BFOQ exemption applies is that of a captain of police rather than a generic class such as law enforcement personnel. To prove a BFOQ defense, the defendants must show that age is a qualification for a person to satisfactorily perform the duties of captain on the Minneapolis Police Department.

The defendants have not contended that substantially all older persons are unable to perform the duties of police captain safely and efficiently. Indeed, the witnesses for both sides[3] agreed that individuals show the effects of aging at different rates, and

---

2. In the event that the United States Supreme Court should hold that the ADEA is unconstitutional as applied to state and local governments, the defendants may apply to the Court for such relief as may be appropriate in light of that decision.

3. The Court was particularly impressed with the obvious high caliber of the expert witnesses presented by both parties in this case. Further, many of the police department witnesses, specifically including Chief Bouza, are persons of high quality, sensitivity, and judgment.

all of the witnesses agree that some persons over age 64 could safely and efficiently perform the duties of a police captain and that some persons over age 64 could not perform those duties. The defendants contended at trial that a very substantial number of ·police captains over age 64 lack the ability to safely and efficiently perform their duties and that it is impossible to evaluate the fitness of individual captains other than by reference to age.

In presenting their case, the defendants relied, at least in part, on the prospective change in the duties of captains on the Minneapolis Police Department which may occur as a result of the planned phase-out of the position of inspector. To base a decision on what the duties of a captain on the Minneapolis Police Department may become in the future would require the Court to engage in conjecture. Uncertainties remain about whether the plan will be fully implemented. Even if implemented, it is impossible to determine how the duties of captains may change. If the plan to eliminate the inspector position were already accomplished in the fashion that the defendants conceptualize it, the result in this case might be different. But because the plan is speculative, the decision must be based on the duties of a police captain at the time of this trial.

The 16 captains of the Minneapolis Police Department are basically managers·and executives. They manage the day to day affairs of their division and supervise the activities of their subordinates. The duties and job pressures are similar to the duties and job pressures felt by most managers in a business enterprise. At least 95 percent of a captain's work consists of office-type supervisory work. Although the remaining five percent may involve some command presence in the streets, the amount of time a captain spends on the streets, and how involved in general law enforcement duties a captain becomes, is subject to a broad range of discretion. A police captain's role in street situations involves commanding and coordinating the activities of subordinate officers rather than front line activity.

The functions of a captain are vastly different than those of subordinate police personnel. The important attributes of a captain involved in a street situation are good judgment, ability to make sound decisions under stress, and a thorough knowledge of appropriate police behavior and responses. These attributes are primarily derived through training, experience and maturity. Although good physical fitness and mental health are also required, a captain's duties do not demand as much physical activity as is required of subordinate officers.

The defendants have stressed that captains are sworn officers who must respond when they encounter a crime in progress as would any other officer of any rank, whether on or off duty. This argument, however, does not raise an important concern. A similar argument was dismissed in *Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228 (5th Cir. 1969), where an employer argued that women could not perform the duties of the job in question because of the difficulty of certain emergency measures. The primary emergency measure involved handling a 34 pound fire extinguisher in case of a fire. The Fifth Circuit summarily rejected the argument as essentially an insignificant consideration. Like the possibility of a fire emergency in *Weeks*, the possibility that a police captain will encounter a major crime in progress is speculative.

The medical evidence presented by the defendants impressively demonstrated the debilitating effects of age on the general population. It tended to show that age may be a qualification for some of the more strenuous occupations in law enforcement work, but failed to establish age as a BFOQ for captains of the Minneapolis Police Department. Persons age 65 or older may suffer a diminution of sensory, cognitive and physical abilities. Nevertheless, the loss of many of the skills a police captain needs may be detected through relatively basic physical and mental examinations or through peer performance evaluations. Moreover, the skills a police captain uses on a day to day basis—communicating with

other persons, supervising the work within a division, and planning activities—are those needed by any mid-level manager and have not been shown to decline with age. The medical evidence submitted by the defendants simply did not demonstrate that it is impossible to weed out those older persons who are unable to perform the duties currently assigned to police captains other than by reference to age.

■ In reaching the conclusion that age is not a BFOQ for Minneapolis Police Department captains, the Court is mindful of the determination by the state legislature that police department employees in cities of the first class should retire upon reaching age 65. Minn.Stat. § 423.075, Subd. 1. The Court must grant deference to this legislative determination, but is not required to accord it a presumption of validity. *City of St. Paul,* 671 F.2d at 1167–1168. The deference accorded to this statutory determination, however, does not change the weight of the defendants' burden of proof. It is but one part of the evidence in this case. Even with it, the defendants have failed to carry their burden of proof.

Finally, the defendants contend that Congress intended the BFOQ exemption to apply to all law enforcement personnel. The defendants submit that federal regulations may establish whether a particular position qualifies for the BFOQ exemption, and that 29 C.F.R. § 860.102(d) permits mandatory retirement if the requirement is imposed "for the safety and convenience of the public." *Id.* The approach advocated by the defendants was followed in *Tuohy v. Ford Motor Co.,* 490 F.Supp. 258 (E.D.Mich.1980). However, the *Tuohy* rationale was expressly rejected by the Eighth Circuit in its *City of St. Paul* decision, thereby foreclosing the defendants' argument.

■ In summary, the Court concludes that age is not a BFOQ for captains on the Minneapolis Police Department. This decision is primarily based on the nature of the duties currently performed by the police captains. The ADEA permits discrimination based on age if youthfulness of the members of an occupation is proven to be reasonably necessary to the particular business. However, as the Eighth Circuit recently stated: "We cannot believe that the ADEA was intended to allow a city to retire a police dispatcher because that person is too old to serve on a SWAT team." *City of St. Paul,* 671 F.2d at 1166. The evidence here established that the duties now performed by Minneapolis Police Department captains, as distinguished from what the defendants believe the duties ought to be or will be, are far more similar to those of a dispatcher than to those of a member of a SWAT team.

Congress, in its wisdom, has established age 70 as the presumptive retirement age in the absence of a valid bona fide occupational requirement to the contrary. This follows a growing and well established trend which recognizes that those persons formerly considered "elderly" are fully capable of performing substantial and important duties. This Court recognizes, accepts, and approves that concept. Consequently, and on the basis of the entire record before the Court, the defendants will be enjoined from requiring Captain Anschutz to retire as a captain of the Minneapolis Police Department.

IT IS HEREBY ORDERED that the defendants City of Minneapolis and Minneapolis Police Relief Association, their officers, agents, employees, successors and assigns, and all persons acting in concert or participation therewith, are enjoined from requiring the retirement of any captain of the Minneapolis Police Department solely on the basis of that captain having reached the age of 65, and from depriving or threatening to deprive any captain of pension rights based on an attempt to continue employment until age 70.

LET JUDGMENT BE ENTERED ACCORDINGLY.