**Charles P. MAHONEY, Plaintiff,**

v.

**Frank J. TRABUCCO, Commissioner, Massachusetts Department of Public Safety, Defendant,**

and

**Massachusetts State Board of Retirement, Intervenor-Defendant.**

Civ. A. No. 83–2681–MA.

United States District Court,
D. Massachusetts.

Nov. 10, 1983.

Wayne B. Hollingsworth, and David M. Banash, Boston, Mass., for plaintiff.

H. Reed Witherby, E. Michael Sloman, Thomas A. Barnico, Asst. Atty. Gen., Boston, Mass., for defendant.

## OPINION

MAZZONE, District Judge.

This action is brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* Massachusetts State Police Sergeant Charles P. Mahoney challenges the Massachusetts statute that requires all members of the uniformed branch of the State Police to retire at age 50. The plaintiff turned 50 on September 15, 1983, and would have been retired by the state on the last day of September but for an order of this Court, issued on September 14, 1983, with the consent of the parties, enjoining the plaintiff's retirement pending a trial on the merits. The case was tried to the Court on October 27 and October 28, 1983. Pursuant to Rule 52(a), Fed.R.Civ.P., I make the following findings and rulings.

Sergeant Mahoney seeks a declaration that the mandatory retirement statute, M.G.L. c. 32 § 26(3)(a), is invalid as applied to him, and seeks an order enjoining the defendants, the Commonwealth's Commissioner of Public Safety and the State Board of Retirement, from ordering his retirement in accordance with that statute. M.G.L. c. 32 § 26(3)(a) provides as follows:

> Any [member of the uniformed branch] who has performed service in the division of state police in the department of public safety for not less than twenty years, shall be retired by the state board of retirement upon his attaining age fifty or upon the expiration of such twenty years, whichever last occurs.

Although the statute by its terms provides for retirement at age 50 or after 20 years service, whichever comes later, as a practical matter the statute requires all but a few members of the uniformed branch to retire upon reaching 50, because a second statute, M.G.L. c. 22 § 9A, prohibits the State Police from enlisting individuals older than 30 for the uniformed branch.

This action is not the first challenge to the Commonwealth's mandatory retirement age for uniformed state troopers. In *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), the Supreme Court held that the statute was rationally related to a legitimate public purpose and did not, therefore, violate the Equal Protection Clause. *Id.* at 315, 96 S.Ct. at 2568. The Court explicitly noted, however, that the plaintiff in *Murgia* based his challenge to the statute strictly on constitutional grounds, and had not invoked the protections provided by the ADEA. *Id.* at 310 n. 2, 96 S.Ct. at 2565 n. 2. That fact distinguishes *Murgia* from the present action; here, the plaintiff bases his claim squarely on the ADEA.

Enacted in 1967, the ADEA was the product of several years of study, by both

Congress and the Executive Branch, of the problems of older Americans. See generally *E.E.O.C. v. Wyoming,* —— U.S. ——, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). It was adopted to meet two pressing problems: the cost of age discrimination to the national economy and the harm done to individual workers deprived of the opportunity to remain active members of the nation's workforce. At the heart of the ADEA is 29 U.S.C. § 623(a)(1), which provides that "It shall be unlawful for any employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age...."

As originally enacted, the ADEA did not cover employees of state and local governments. Those workers were brought within the Act's protection by an amendment adopted by Congress in 1974. Because the amendment extending the scope of the ADEA's coverage was part of a broader package of amendments to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.,* there is little legislative history relating to the decision to subject state and local governments to the requirements of the Act. *E.E.O.C. v. Elrod,* 674 F.2d 601, 605 (7th Cir.1982). The legislative history does, however, contain the remarks of Senator Bentsen, the sponsor of the amendment, upon its approval by the Senate. He said: "The passage of this measure insures that government employees will be subject to the same protections against arbitrary employment [discrimination] based on age as are employees in the private sector." 120 Cong.Rec. 8768 (1974), *quoted in Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694, 699 (1st Cir.1983). The legislative history also contains a statement offered in support of the amendment by President Nixon in 1972, when it was first proposed:

> Discrimination based on age—what some people call 'age-ism'—can be as great an evil in our society as discrimination based on race or religion or any other characteristic which ignores a person's unique status as an individual and treats him or her as a member of some arbitrarily-defined group. Especially in the employment field, discrimination based on age is cruel and self-defeating; it destroys the spirit of those who want to work and it denies the National [sic] the contribution they could make if they were working.

H.R.Rep. No. 93–913, 93d Cong. 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 2811, 2849, *quoted in Ramirez v. Puerto Rico Fire Service,* 715 F.2d at 699.

In sum, then, the legislative history, though limited, supports the view that the Act was intended to outlaw "... irrational, unjustified employment decisions based upon assumptions about the relationship between age and ability which classify older workers as incapable of effective job performance." *E.E.O.C. v. Elrod,* 674 F.2d at 605.

■ Notwithstanding the broad remedial purpose of the ADEA, it is clear that not every age-based employment decision violates the Act. As the Supreme Court noted in *E.E.O.C. v. Wyoming,* —— U.S. at ——, 103 S.Ct. at 1058, the case which freed from doubt the constitutionality of the 1974 amendment extending the ADEA to state and local governments, the states may establish mandatory retirement ages for state employees if they can prove that age is a "bona fide occupational qualification (BFOQ)" for the job that the plaintiff complaining of age discrimination performs. It is this BFOQ defense which is the central issue in this action, as there is no doubt that the statutory mandatory retirement age constitutes a *prima facie* violation of the ADEA. The Commonwealth asserts, and sought to prove at trial, that age is a BFOQ for members of the uniformed branch of the Massachusetts State Police.

The BFOQ defense is embodied in 29 U.S.C. § 623(f)(1), which provides that:

> It shall not be unlawful for an employer, employment agency or labor organization ... to take any action otherwise prohibited [by the statute] where age is a bona fide occupational qualification reasonably

necessary to the normal operation of the particular business...

■ The BFOQ defense has been the subject of considerable judicial scrutiny. With near unanimity, those courts that have addressed the scope of the BFOQ defense have followed the interpretation put forward by the court in *Usery v. Tamiami Tours, Inc.,* 531 F.2d 224, 235–36 (5th Cir.1976). Under that view of the BFOQ defense, which I follow here,

> ... in order to prevail on a BFOQ defense, an employer must show that the challenged age qualification is reasonably related to the essential operation of the business, and must demonstrate either that there is a factual basis for believing that all or substantially all persons above the age limit would be unable to effectively perform the duties of the job, or that it is impossible or impracticable to determine job fitness on an individualized basis.

*Orzel v. City of Wauwatosa Fire Dept.,* 697 F.2d 743, 753 (7th Cir.1983). *See also E.E.O.C. v. University of Texas Health Science Center,* 710 F.2d 1091, 1093 (5th Cir.1983); *E.E.O.C. v. City of St. Paul,* 671 F.2d 1162, 1166 (8th Cir.1982); *E.E.O.C. v. Missouri State Highway Patrol,* 555 F.Supp. 97, 104 (W.D.Mo.1982); *E.E.O.C. v. City of Minneapolis,* 537 F.Supp. 750, 756 (D.Minn.1982).

■ Thus, under the prevailing legal standard, the threshold question is whether the mandatory retirement age is reasonably related to the essential operation of the Massachusetts State Police. This is a limited inquiry; I must assess the function of the State Police and determine whether the mandatory retirement age is reasonably related to that function. The essential function of the Massachusetts State Police is to protect and serve the citizens of the Commonwealth. *See Massachusetts Board of Retirement v. Murgia,* 427 U.S. at 310, 96 S.Ct. at 2565 ("The primary function of the Uniformed Branch of the Massachusetts State Police is to protect persons and property and to maintain law and order."). I rule that the mandatory age requirement is reasonably related to the protection and service of the citizens of Massachusetts. In so ruling, I am guided by the Supreme Court's opinion in *Murgia,* as the initial focus of analysis in evaluating a BFOQ defense is on the reasonableness of the state policy, an inquiry in many respects similar to the inquiry in an Equal Protection case in which a traditional rather than strict or intermediate level of scrutiny is called for. As the Court held in *Murgia,* "[s]ince physical ability generally declines with age, mandatory retirement at age 50 serves to remove from police service those whose fitness for uniformed work presumptively has diminished with age. This clearly is rationally related to the State's objective." 427 U.S. at 315, 96 S.Ct. at 2567. Thus, I conclude that the Commonwealth has sustained its burden of proof on the first stage of the analysis used to determine whether age is a BFOQ.

The second part of BFOQ analysis is more rigorous. To sustain its contention that age is a BFOQ, the Commonwealth must show either (a) that all or substantially all persons older than 50 cannot effectively perform the duties of the job or (b) that it is impossible or impracticable to determine on an individual basis whether persons older than 50 can effectively perform the duties of the job. This form of analysis raises an important preliminary question: How should the "duties of the plaintiff's job" be defined? The Commonwealth argues that the plaintiff's duties are those of a member of the uniformed branch of the State Police, and asserts that the Court should determine whether age is a valid BFOQ, generally, for members of the uniformed branch. The plaintiff asserts that his duties are different in many respects from those of most Massachusetts State Police officers, and asks that the Court determine whether age is a BFOQ for the work he performs from day to day. In order to present these alternatives in sharper relief, it is necessary to consider the plaintiff's current position with the State Police, and to review the evidence

presented at trial about the work done by most members of the uniformed branch.

 Sergeant Mahoney is a 26-year veteran of the State Police. Since November 1, 1969 he has been assigned to State Police General Headquarters in Boston, where he has worked as a telecommunications specialist. He serves as the State Police liaison with the Massachusetts Criminal History Systems Board and trains state and local police officers in the use of police telecommunications systems. He is responsible for maintaining the accuracy of certain crime records which he from time to time supplies to State Police officers and federal and local investigators. He works Monday through Friday, from 8:25 a.m. to 5 p.m., in contrast to the hours of most State Police officers, who work for four days, then have two days off. In sum, then, Sergeant Mahoney's daily routine is, in essence, that of an office worker holding a desk job.

Sergeant Mahoney remains, however, a sworn member of the uniformed branch of the State Police. He carries a gun on duty. He has a responsibility to aid citizens in emergencies on the state's highways. He is obligated to take action when criminal activity occurs in his presence. He is subject to transfer to another assignment, including one that involves road duty. He is also subject to call in an emergency situation such as a prison disturbance.

Since his assignment to General Headquarters 14 years ago, Sergeant Mahoney has only infrequently been called upon to respond to emergencies or fill in at other job assignments. For six weeks in 1972 or 1973, he was assigned to road duty at the State Police barracks in Andover. He was called to two prison disturbances in the early 1970's, one at the state prison at Walpole, the other at MCI–Norfolk. Sergeant Mahoney testified that his function at the scene of both disturbances was that of a "radio man." In 1976 he was assigned to communications duty during the bicentennial Tall Ships celebration. He acted as a communications officer during the Blizzard of 1978, and worked in the same capacity during the 1979 visit of Pope John Paul II. A number of Sergeant Mahoney's superior officers testified that he currently discharges his duties effectively and satisfactorily.

The majority of the members of the uniformed branch perform daily duties that are quite different from Sergeant Mahoney's, according to the testimony of the defendant Commissioner of Public Safety, Frank J. Trabucco, and the testimony of a number of other members of the uniformed branch, including several members of the command staff.

Some two-thirds of the approximately 1,040 members of the uniformed branch are responsible, from day to day, for patrolling the state's highways and responding to calls for assistance from members of the public or local police departments. Their jobs, in short, involve road duty. They are called upon to stop cars on the highway, make arrests, take suspects into custody and may on occasion be required to physically subdue suspects resisting arrest. They work outside in the snow and are sometimes required to push vehicles or carry heavy objects through the snow. They sometimes find it necessary to chase suspects on foot over considerable distances. They are called upon to react to disturbances in the state prisons, and are required to report to work to aid the public in natural disasters and emergencies. They must on occasion engage in high speed chases. In sum, a state trooper assigned to road duty is not infrequently required to engage in strenuous physical activity and is subject to physical danger on some occasions. Officers who, like the plaintiff, enjoy the rank of Sergeant, are among those assigned to road duties, often as patrol supervisors, and in that capacity are exposed to the same kinds of physical stress and danger as many other members of the uniformed branch.

The medical evidence offered by the Commonwealth in support of its BFOQ defense reinforces the importance of determining whether the duties of the job at issue are those of a uniformed state police officer, generally, or those of an officer

who performs the daily tasks that the plaintiff performs. The Commonwealth called two medical experts, Dr. Alexander Lind, a physiologist, and Dr. Albert Antlitz, a cardiologist. Dr. Lind testified that, on average, an individual's aerobic capacity decreases 30% between the ages of 20 and 50. He testified that he had heard Massachusetts State Police officers give evidence during the trial about the nature of their jobs, and that he had also talked to State Police officers before the trial began. He concluded that all or substantially all individuals over 50 lacked the aerobic capacity to perform the duties of Massachusetts State Police Officers safely and effectively.

Dr. Antlitz, the cardiologist, testified that, at age 50, 75% of the population suffers from substantial but asymptomatic coronary artery disease. This presents no significant difficulty for most individuals, he testified. But it poses extreme hazards to individuals suffering from coronary artery disease who perform the duties of Massachusetts state troopers and, in addition, creates danger to the safety of the public that the troopers are charged with protecting, he said. He also testified that it is possible to predict which asymptomatic individuals were likely to experience coronary incidents—myocardial infarctions, angina, or the like—with only 1 percent accuracy.

However, both doctors testified that, in their opinions, age was not a BFOQ for a position that involved the daily activities that Sergeant Mahoney typically performs. Substantially all individuals could perform that kind of work for many years after age 50, they said.

The plaintiff offered no medical evidence to rebut the testimony of the Commonwealth's medical experts. Thus, were I to rule that the duties of the job at issue in this case are the duties of a member of the uniformed branch, generally, rather than the duties that the plaintiff actually performs, I would conclude that the Commonwealth had met its burden of proof on the BFOQ defense.[1] Uncontradicted medical testimony indicates that all or substantially all 50 year-olds could not safely and effectively perform the duties of a State Police officer. In addition, uncontradicted medical evidence indicates that it is impracticable or impossible for the Commonwealth to make individual determinations of an officer's fitness to serve on the State Police after age 50.

Thus, in order to determine whether further analysis is necessary, I must determine whether it is the duties of uniformed State Police officers generally, or the duties regularly performed by Sergeant Mahoney, that are relevant to this dispute. This is essentially a question of statutory interpretation. The Commonwealth argues that the language of the BFOQ defense, which creates an exception when age-based employment practices are "... reasonably necessary to the normal operations of the *particular business...*" (emphasis supplied), requires that I consider the validity of the BFOQ in relation to the "particular business" at issue—that is, the entire uniformed branch of the State Police. In support of its position the Commonwealth relies upon *E.E.O.C. v. Janesville,* 630 F.2d 1254 (7th Cir.1980). In *Janesville,* the Court of Appeals reversed a district court decision holding that the particular duties of the plaintiff, a police chief, rather than the duties of city police officers generally, should determine whether a BFOQ defense to an action attacking a mandatory retirement age should prevail. The Court of Appeals held that Congress' use of the words "particular business" foreclosed the district court from considering the specific job duties of particular plaintiffs. Such an interpretation, the court said, would effectively change the words "particular business" to "particular occupation"—a result

---

**1.** This ruling is intended only as a judgment on the evidence presented at trial. I do not rule that age 50 is a BFOQ for State Police officers as a matter of law; individual cases are likely to turn on the medical evidence presented at trial.

As noted above, the plaintiff herein presented no such evidence and, therefore, the uncontradicted medical evidence presented by the Commonwealth compels this conclusion in this case.

that Congress itself could have accomplished had it so desired. Thus, in order to prevail on its BFOQ defense, the city need only prove that age was a BFOQ defense for city police officers generally.

On the other hand, in a case involving similar facts, the Eighth Circuit Court of Appeals rejected the Seventh Circuit's *Janesville* reasoning. *See E.E.O.C. v. City of St. Paul*, 671 F.2d 1162 (8th Cir.1982). In *City of St. Paul*, the Court of Appeals affirmed a district court judgment that treated fire chiefs differently than rank-and-file firefighters for the purposes of evaluating a BFOQ defense to a challenge to a mandatory retirement ordinance. The court concluded that Congress' use of the word "occupational" in creating the BFOQ defense permitted courts to consider the particular duties of individuals facing mandatory retirement. The court also relied on the Congressional statement of the purpose of the legislation, set out in the language of the ADEA itself, 29 U.S.C. § 621(b)— namely, "to promote employment of older persons based on their ability rather than age." The court said:

> It would be inconsistent with the goal of ability-based decisions to allow a city to retire a fire chief or a police chief who was completely able to fulfill his duties because he was unable to fulfill the duties of another position within the department, such as a fire captain or patrolman... *We cannot believe that the ADEA was intended to allow a city to retire a police dispatcher because that person is too old to serve on a SWAT team* (emphasis supplied).

*Id.* at 1186.

After consideration of the language of the statute, and the policy aims that prompted Congress to adopt it, I conclude that the position taken by the court in *E.E.O.C. v. City of St. Paul* represents the better view. The statutory language uses both the words "occupational" and "business." I cannot conclude, therefore, that the language of the statute is so clear as to forbid consideration of the specific duties of particular persons. More important, as

the Supreme Court noted in *E.E.O.C. v. Wyoming*, the ADEA requires a state to make determinations about the retirement of its employees "in a more individualized and careful manner..." 103 S.Ct. at 1062. The adoption of the ADEA substantially increased the measure of federal legal protection afforded older Americans. Private and public employees can no longer cut short careers by relying on stereotypes about what older people can and cannot do, or on labels about what a job does or does not require—more is necessary. In my judgment, the policies of the ADEA are best effected by evaluating the Commonwealth's BFOQ defense against the requirements of the job that Sergeant Mahoney has actually performed in the past and is likely to perform in the future. To evaluate the state's BFOQ defense against the more demanding requirements of the typical member of the uniformed branch would only serve to perpetuate the stereotyping and labelling that the ADEA was designed to prohibit, and would ignore the Act's instruction to treat older Americans on the basis of individual ability.

As noted above, the Commonwealth's medical experts testified that, in their opinion, age was not a BFOQ for a job which requires the level of exertion that Sergeant Mahoney's does on a day-to-day basis. This testimony does not, by itself, establish that age is not a BFOQ for Sergeant Mahoney's position, however. As the plaintiff and his commanding officers testified, two sets of factors distinguish the duties of Sergeant Mahoney from the routine of a civilian whose job requires the identical level of day-to-day exertion. First, the plaintiff is subject to transfer at any time, and could be transferred to a road position— that of patrol supervisor, for example— which involves substantial physical stress. The medical evidence presented at trial suggests that age is a BFOQ for many of the positions to which the plaintiff could be transferred. Second, Sergeant Mahoney remains a sworn member of the uniformed branch of the State Police. As such, he is subject to call for emergency duty and is responsible for taking action when he ob-

serves criminal activity. I shall consider each of these factors in turn.

It is undisputed that the Commissioner of Public Safety has absolute authority to transfer the plaintiff to an assignment that would require more strenuous physical activity. At trial, however, Commissioner Trabucco testified that it was very likely that Sergeant Mahoney would not be reassigned unless he failed to perform his duties effectively. Sergeant Mahoney's telecommunications job requires some technical expertise, Commissioner Trabucco testified (though less expertise than State Police ballisticians or fingerprint experts), a factor which decreases the likelihood that Sergeant Mahoney will be reassigned. Commissioner Trabucco testified that he could not of course "guarantee" that the plaintiff would not be reassigned. But the evidence indicates that the possibility of reassignment is quite speculative and, in my judgment, the chance that Sergeant Mahoney may be reassigned to a job for which age is a BFOQ is, on the evidence presented, of only limited importance in determining whether the state has sustained its burden of proof on the BFOQ defense. See E.E.O.C. v. City of Minneapolis, 537 F.Supp. 750, 757 (D.Minn.1982) (Because plan to reorganize department, so as possibly to require plaintiff police captain to perform more strenuous duties is speculative, "... the [court's] decision must be based on the duties of a police captain at the time of his trial.").

The fact that the plaintiff may be called on special assignment, and is required to intervene when he observes criminal activity, is also of limited importance here, in my judgment. The evidence established that Sergeant Mahoney has been called to arguably risky special assignments on only three occasions in the past 14 years and has acted in his capacity as a telecommunications specialist each time. In addition, Sergeant Mahoney testified that he could not remember the last time that circumstances required that he intervene at the scene of a crime. For these reasons I conclude that the bare possibility that the plaintiff may be called upon to perform strenuous physical activity in an emergency does not appreciably alter the analysis of the duties of the job he performs. *Id.; see also Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228 (5th Cir. 1969) (in Title VII action, the fact that female plaintiff would be required to handle a 34 pound fire extinguisher in an emergency merited little consideration).

Because the medical experts who testified at trial agreed that age imposed no barrier to an individual's continued performance of a job whose duties require only the level of exertion that plaintiff performs from day to day, and I conclude that the fact that Sergeant Mahoney is a sworn member of the uniformed branch is unlikely to alter the physical dimension of the duties of his job, I rule that the Commonwealth has failed to meet its burden of proving the BFOQ defense.

In so ruling, I am not unaware of certain considerations of policy that argue in favor of a contrary result. I have considered the possibility that this ruling might be viewed as favoring those members of the uniformed branch whose duties may not require top physical condition and who, therefore, would not be subject to the mandatory retirement age. My fears in this regard are allayed by Commissioner Trabucco's testimony that, with only a few exceptions, a particular officer's physical fitness—or lack thereof—is not taken into account when decisions about assignments or calls to emergency duty are made. In addition, officers receive physicals every two years, and these examinations could serve as a means to evaluate the ability of any officer to remain with the State Police. Indeed, this is the kind of case-by-case decision-making that the ADEA was designed to encourage.

Also, as noted above, the Commissioner has the authority to transfer the plaintiff to another post. I must assume that that authority will always be used in furtherance of the essential function of the State Police to protect and serve the citizens of the Commonwealth.

I am also aware that the method of analysis I have used, which focuses on the specific duties of particular persons, could lead to a state of affairs in which some, but not all, of the members of the uniformed branch may be retired upon reaching age 50. This problem is exacerbated by the fact that the amount of physical activity members of the uniformed branch are required to perform does not, according to Commissioner Trabucco's testimony, vary in a regular and consistent way with rank—some officers of a given rank may be required to engage in strenuous activity on the job, others may not. In an organization whose structure is modelled on the military, the possibility of inconsistent treatment of officers of the same rank may be expected to cause some difficulties. Nonetheless, the history of the ADEA suggests that the 1974 amendments extending coverage to public employers was intended to subject the age-based employment practices of state governments to the same intense scrutiny as the practices of private employers. The ADEA calls upon the state to treat each of its employees according to his or her ability to get the job done. And, as the Supreme Court has held in the closely related Title VII sex discrimination context, *see Lorrillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978), the BFOQ defense was "... in fact meant to be an extremely narrow exception ..." to the proscription of discrimination. *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977).[2]

2. I do not, of course, venture predictions about the outcomes of ADEA actions that other State Police officers might bring. It is likely, however, that resolving these issues in court, on a case-by-case basis, will have certain adverse consequences. First, individual officers nearing the age of 50 may find it difficult to make informed decisions about their futures. Second, the State Police command staff may find it difficult to make duty assignments without substantial uncertainty about the duration that any individual will be able to remain at a particular post. Third, a case-by-case analysis might interfere with the smooth operation of the state pension system. Perhaps a more careful delineation of functions within the uniformed branch is required in order to recognize the purposes and policies underlying the ADEA.

Therefore, for the reasons stated above, I find and rule that M.G.L. c. 32 § 26(3)(a) is invalid as applied to the plaintiff, and I enjoin the defendant and the intervenor-defendant Massachusetts Board of Retirement from enforcing that statute against him so long as he continues to work at his current assignment.[3]

SO ORDERED.

See *E.E.O.C. v. Wyoming*, 103 S.Ct. at 1062. That examination is not our function here.

3. After trial, the Court allowed the plaintiff's motions to amend his complaint in order to conform the prayer for relief with the evidence introduced at trial. See Fed.R.Civ.P. 15(a)–(b) (leave to amend shall be freely given when justice so requires, even after trial). The defendants opposed the motion. The Court may in any event grant only that relief which the plaintiff has proved he is entitled to; here, the plaintiff has demonstrated that *he* is entitled to relief and, as noted above, the law supports the view that *his particular duties* are relevant. The defendants suffer no prejudice from my reaching a decision of narrower scope than that originally sought by the plaintiff.