Gerald E. SMALLWOOD, Appellant,

v.

UNITED AIR LINES, INC., Appellee.

Equal Employment Opportunity Commission, Amicus Curiae.

Gerald E. SMALLWOOD, Appellee,

v.

UNITED AIR LINES, INC., Appellant.

Equal Employment Opportunity Commission, Amicus Curiae.

Nos. 80–1111, 80–1153.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 3, 1981.

Decided Oct. 8, 1981.

Rehearing and Rehearing En Banc Denied Jan. 8, 1982.

Melissa Langa, E. E. O. C., Washington, D. C. (Leroy D. Clark, Gen. Counsel, Constance L. Dupre, Acting Associate Gen.

Counsel, Vella M. Fink, Acting Asst. Gen. Counsel, Washington, D. C., on brief), for amicus curiae.

Wyatt B. Durrette, Jr., Fairfax, Va. (Michael C. Montavon, Chess, Durrette & Roeder, P. C., Fairfax, Va., on brief), for appellant.

Hans U. Stucki, United Air Lines, Inc., Chicago, Ill. (Gregory L. Murphy, Murphy, McGettigan, McNally & West, Alexandria, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Circuit Judge, and SPROUSE and ERVIN, Circuit Judges.

SPROUSE, Circuit Judge:

Gerald E. Smallwood, plaintiff below, appeals the judgment of the district court in favor of the defendant United Air Lines, Inc. in his age discrimination action. After a bench trial, the district court found that United's rule denying employment to pilot applicants over the age of 35 was a bona fide occupational qualification (BFOQ) and that the airline did not violate the Age Discrimination in Employment Act[1] by refusing to employ Smallwood because of his age. The major issue on appeal is whether the trial court's decision was clearly erroneous in finding factually that United had sustained its burden of showing that this age requirement is a BFOQ. We reverse.

## I.

Smallwood applied to United for a position as a Flight Officer[2] in August, 1977.

---

1. 29 U.S.C. §§ 621–34. The Act's statement of findings and purpose is found at 29 U.S.C. § 621:

   (a) The Congress hereby finds and declares that—
   (1) in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs;
   (2) the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;
   (3) the incidence of unemployment, especially long-term unemployment with resultant deterioration of skill, morale, and employer acceptability is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave;
   (4) the existence in industries affecting commerce, of arbitrary discrimination in employment because of age, burdens commerce and the free flow of goods in commerce.
   (b) It is therefore the purpose of this chapter to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment.

   The operative section of the Act provides that
   (a) It shall be unlawful for an employer
   (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
   (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
   (3) to reduce the wage rate of any employee in order to comply with this chapter.

   29 U.S.C. § 623(a). The Bona Fide Occupational Qualification exception provides that
   It shall not be unlawful for an employer, employment agency, or labor organization—
   (1) to take any action otherwise prohibited under subsection (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age;

   29 U.S.C. § 623(f)(1).
   At trial, it was conceded by all parties that United's policy differentiated on the basis of age, and that Smallwood was within the class of persons protected by the Act. Therefore, the only issue at trial was whether United's policy constituted a BFOQ.

2. United's operational scheme classifies members of aircraft crews as Flight Officers. Within this classification are three positions of seniority and responsibility. All new hires begin as Second Officers, or flight engineers, and then may advance to First Officer, or Co-pilot, and finally to Captain, the command officer on each aircraft. The record discloses that United operates a variety of aircraft ranging from the B–737 jet to the larger and more sophisticated B–747. A normal line of progression has a Flight Officer beginning as a Second Officer on a B–737 and moving up in equipment until they

At that time he was 48 years old and had flown 10 years for Overseas National Airways (ONA) in a variety of positions.[3] United replied to Smallwood's employment application with a form letter which listed United's "basic qualifications." Next to "Age 21 through 29" appeared a light pencil check mark. The letter stated that United could not offer "immediate encouragement," but that Smallwood's application would be retained on file should future reconsideration be warranted. Smallwood replied, requesting reconsideration in light of "our national policy against age discrimination in employment." United replied in December, 1977 that, while Smallwood possessed "fine qualifications," the airline was only processing applications from applicants 21 through 35 years of age. In March, 1978 Smallwood notified the Wage and Hour Division of the Department of Labor that he was charging United with age discrimination and would resort to private litigation if necessary. A conciliation hearing was held between Smallwood, representatives of the Department of Labor and United in April, 1978. On May 5, 1978, United notified Smallwood that while its pilot progression system was designed in the interest of the flying public, there were significant costs involved in the training of pilots, and when coupled with federally-mandated retirement at age 60, a maximum age of 35 at hire was necessary to achieve peak productivity. On May 19, 1978 the Department of Labor notified Smallwood that attempts at conciliation were not fruitful and he was free to proceed as he deemed appropriate. This suit resulted.

■ United, in initially answering Smallwood's complaint, did not raise the BFOQ defense. In an amended answer filed 50 days later, United alleged the BFOQ exception as an affirmative defense. We find no merit to Smallwood's objection to the trial court's action allowing the amendment pursuant to Fed.R.Civ.P. 15(a). Therefore, the factual issue of whether the age limitation was a BFOQ because it was necessary for the safety of United flights was properly before the trial court.

## II.

United's main evidentiary thrust at trial was that airline safety would be adversely affected if it were forced to hire pilots over the age of 35.[4] Its contentions at trial and on appeal are two-fold: that hiring older pilots would impede its "crew concept"—the safe and effective operation of its 3-man crews in a coordinated manner—and that hiring pilots over the age of 35, significantly raising the average age of pilot personnel, would disproportionately increase the chance of medical emergencies during flight.

United's evidence was that older pilots whose experiences were with other airlines might not safely integrate with United's crews. Their expert witnesses testified that the basis of the "crew concept" was that their pilots interacted effectively because throughout their career they learned one, and only one, method of aircraft operation—United's. Their testimony focused on the fact that there was an "untraining" factor to be considered when evaluating the desirability of employing pilots with significant prior experience. It was further noted that difficulties might arise when someone moved from a command position elsewhere

are a Second Officer on a B–747. They would then return to the B–737 as a First Officer, or Co-pilot, and again move up through United's aircraft fleet. A like system is used for advancement as a Captain.

3. The record indicates that Smallwood joined ONA in 1967 and served as a first officer and captain on DC–8, DC–9 and DC–10 aircraft. It should be noted that United's aircraft fleet includes both DC–8 and DC–10 aircraft and that Smallwood received flight training while at ONA at United's flight training facilities. ONA

ceased operations shortly after Smallwood was furloughed in 1977. United contended at trial and on appeal that Smallwood was terminated from employment with ONA for misconduct, which Smallwood denied. This issue was not resolved at trial.

4. It should be noted, however, that United's opening statement and initial witness focused on the economic justifications for the age-35-at-hire rule.

to a subordinate position with United. Smallwood, on the other hand, presented uncontradicted evidence that major air carriers find applicants with prior Navy or Air Force experience especially desirable.

■ Medical evidence proffered by United focused on the greater incidence of the conditions which require grounding in pilots ages 50–59. United theorized that such groundings demonstrated a greater potential for in-flight incidents involving older pilots. Dr. Kidera, United's only medical witness, testified that United's company medical examinations were effective in the screening of those individuals whose medical condition posed a threat to air safety, but that medical technology cannot detect all latent health problems. He particularly stressed that it was impossible to pre-determine incidents of minor "strokes" which would probably strike older persons more frequently than younger ones. Testimony of Smallwood's expert witness, on the other hand, was centered on the high degree of certainty with which current medical techniques can predict potential cardiovascular problems. The district court expressly did not adhere to the views of either medical expert in reaching its decision. The trial court made no written findings, but in a ruling announced from the bench adopting most of United's proposed findings of fact, found that the 35 year-old maximum age for new hires was a BFOQ, as United had borne its burden of showing that there was a factual basis for its belief that "all people over 35 would be unable to perform safely and efficiently the duties of a flight officer" and that it would be impracticable to deal with each applicant on a case-by-case basis. Viewing them, as we must, in the context of the test adopted by this court in *Arritt v. Grisell,* 567 F.2d 1267 (4th Cir. 1977), these findings are clearly erroneous. Fed.R.Civ.P. 52(a).

### III.

■ There can be no doubt that United's crew concept is designed to foster safer flight techniques. Pilots, as a group, must, of course, endure the same aging process as the general population. These unassailable observations, however, are of no help to United in claiming a BFOQ exception for its hiring practices. The legal principle guiding the application of this statutory exception was settled by this court in *Arritt, supra.* To justify a refusal to hire under the BFOQ exception contained in the Age Discrimination in Employment Act, the burden is on the employer to meet a two-prong test:

> (1) that the BFOQ which it invokes is reasonably necessary to the essence of its business ... and (2) that the employer has reasonable cause, i.e., a factual basis for believing that all or substantially all persons within the class ... would be unable to perform safely and efficiently the duties of the job involved, or that it is impossible or impractical to deal with persons over the age limit on an individualized basis.

*Id.* at 1271. This exception is to be narrowly applied. *Burwell v. Eastern Airlines, Inc.,* 633 F.2d 361, 370 n. 15 (4th Cir. 1980) (en banc), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981).

■ In reviewing the trial court's resolution of this issue we are impressed with United's overriding theme that hiring older pilots threatens it with burdensome economic effects. United, during pre-trial discovery, reiterated the position taken in its second letter to Smallwood, that is, that there are substantial costs involved in maintaining its pilot progression system, including a significant investment in training as an officer moves between positions and aircraft type. Therefore, by insisting that new pilots be under 35 years of age, the "period of peak productivity" would be extended. Economic considerations, however, cannot be the basis for a BFOQ—precisely those considerations were among the targets of the Act. *See* 29 C.F.R. § 860.103(h) (1980); *cf. City of Los Angeles v. Manhart,* 435 U.S. 702, 716, 98 S.Ct. 1370, 1379, 55 L.Ed.2d 657 (1978) (cost-justification defense not available in Title VII action). Taking United's defense of a safety-based

BFOQ at face value, however, it still does not satisfy the *Arritt* burden.

United contends that it must "untrain" pilots with experience gained flying for other airlines, yet the record indicates that most new pilots are hired from a pool of ex-military pilots with many years flying experience.[5] There was evidence of only one incident involving a newly hired pilot integrating into an older United crew, and no evidence, statistical or otherwise, concerning the relative ease of integration into the system of ex-military pilots, those joining United by merger, or other newly hired pilots.[6] In short, there is no reliable evidence that United's "crew concept" would be impaired by the sole factor of hiring Flight Officers, starting as Second Officers, over the age of 35. This alleged harm to the "crew concept" is a function of prior experience, not age at hire.

Likewise, United's medical evidence cannot establish that its age requirements are a BFOQ under the *Arritt* standards. Under United's pilot progression policy, Smallwood, if employed, would probably remain a Second Officer until his mandatory retirement at age 60.[7] It is undisputed that a significant number of United's pilots maintain Second Officer status from hire to mandatory retirement to age 60. Not only is there no significant evidence tending to prove "that all or substantially all persons within the class would be unable to perform safely and efficiently," *Arritt, supra,* but the employment of Smallwood would not create a new class or group of pilots in this respect—he would simply become part of a group of second officers 35 years of age or over, whose continued status as pilots strongly tends to disprove United's contention that the employment of pilots in this age group violates their air safety standards. Even were this not so, United's attempt to establish a BFOQ is further frustrated by the second prong of the *Arritt* test. United has provisions in place for the medical testing of its pilots of all ages. United's expert medical witness Dr. Kidera testified at trial that while the FAA mandates periodic physical examinations of all Flight Officers, United's company physical far exceeds the FAA's minimum requirements. Aimed at a preventive medicine approach, United includes extensive laboratory tests, blood screening, electrocardiograms, urinalysis, chest x-rays and diabetes screening. Examinations are given to Captains every 6 months and to First and Second Officers annually. The scope and depth of each examination is identical across each flight crew position. It was conclusively shown at trial that United's physical examination program was effective

**5.** The record indicates that United requires a minimum of 350 hours of prior flight experience, and that from October, 1977 until July, 1978 would accept applications from applicants age 30–35 only if accompanied by advanced flight credentials. Additionally, the uncontradicted testimony of Dr. Mohler, Smallwood's expert witness at trial and former Director of the FAA's Civil Aeronautical Medical Research Institute, indicated that most of today's younger airline pilots are taken directly from the Navy or Air Force, whenever these pilots are available.

**6.** In the early 1960's United merged with Capital Airlines to become, at that time, the largest passenger airline in the free world. At that point, Capital personnel were dovetailed into the United flight crew system, with a significant number of Capital command personnel, pilots and co-pilots, moving laterally into equivalent positions with United. Testimony at trial was to the effect that an incident occurred due to a former Capital Captain's failure to follow a United procedure. The record does not indicate whether he merely deviated from United's procedure or reverted to that of Capital.

**7.** FAA regulations mandate retirement of pilots and co-pilots at age 60. 14 C.F.R. § 121.383(c) (1980). United mandates retirement at age 60 of all flight officers, including Second Officers. Advancement of flight officers is governed by United's collective bargaining agreement with the Airline Pilots Association, and is on the basis of seniority. Actual experience at United reveals that 8 to 10 years is required for advancement from Second to First Officer, and an additional 6 to 8 years from First Officer to Captain. United does not have an "up and out" policy, so it is conceivable that a flight crew member could remain a second officer indefinitely. If no officer bids on a vacancy, the position is mandatorily awarded to the most junior officer, using an inverse seniority system.

in detecting potentially disabling medical conditions, and that future cardiovascular problems could be detected with a high degree of predictability. These preventive medical examinations must have the same degree of predictability as to future medical disabilities for newly-hired 48-year-old pilots from other airlines as they would for career United pilots. In short, United's evidence at trial, while probative of the incidence of medical problems in pilots of advanced age and of the effectiveness of its own examination system, failed to show a relationship between a maximum age-at-hire limitation and airline safety. It has failed to show the impossibility or impracticality of dealing with applicants individually.

## IV.

United, on cross-appeal, contends that Smallwood's claim is time-barred by 29 U.S.C. § 626(d)(1),[8] which requires that a charge alleging discrimination be filed with the Department of Labor within 180 days of the alleged discriminatory act. United's first reply to Smallwood's application was dated August 24, 1977 and was received by Smallwood shortly thereafter. The charge of discrimination was filed by Smallwood on March 24, 1978, 212 days later. United's second letter to Smallwood was dated December 12, 1977. He argues that United's refusal to employ him, communicated by the second letter, was a discrete act comprising age discrimination. (His charge was filed within 180 days from that date.) The trial court held that the discrimination was committed by United's first letter of August 24, 1977, but that Smallwood's claim was not barred because equitable considerations tolled the running of the 180-day period.

We agree the claim is not time barred, but do not reach the issue concerning equitable tolling of the statute of limitations. United's first response was a form letter on which was printed a list of United's "basic qualifications." One of the listings simply stated "age 21 through 29" and next to this, when Smallwood received it, was a light pencil check mark. Significantly, Smallwood's application was not rejected by this letter. Rather, he was informed that United could not offer "immediate encouragement" and that his application would be retained on file for possible future consideration. It was United's second letter to Smallwood that clearly rejected his request for employment. We agree with Smallwood this letter of December 12, 1977, comprised the discrete act of discrimination and that this act occurred less than 180 days prior to the filing of Smallwood's charge with the Department of Labor.

The judgment of the trial court is, therefore, reversed and remanded for action consistent with this opinion.

*REVERSED AND REMANDED.*

---

8. (d) No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Secretary. Such charge shall be filed—
    (1) within one hundred and eighty days after the alleged unlawful practice occurred,
    . . . .
29 U.S.C. § 626(d)(1). This section was amended in 1978 to its current language. Previously, the section focused on "notice of intent to sue." The 1978 amendment is applicable to all civil actions brought after April 6, 1978. Smallwood's complaint was filed May 18, 1979. Smallwood's letter to the Department of Labor was captioned "Notice of Intent to Sue— Charge of Discrimination." *See* H.Conf.Rep. No.95–950, 95th Cong., 2d Sess., 12, *reprinted in* [1978] U.S.Code Cong. & Ad.News 528, 533.