IT IS HEREBY ORDERED that defendants' motion to dismiss be and is GRANTED.

IT IS FURTHER ORDERED that plaintiff's complaint be and is dismissed without prejudice.

IT IS FURTHER ORDERED that plaintiff's motion to compel state public safety director to revoke illegally obtained non-elected peace officer certification issued defendant, motion to compel election board officials to strike defendant's name off November 6, 1984, general election ballot as unlawful, invalid and disqualified candidate for Sheriff, and motion for summary judgment be and are DENIED as moot.

Suzanne M. HAHN, Patricia J. Koch, Mary Catherine O'Sullivan, Diane M. Smith, Sandra C. Walker, Linda D. Craig, Josephine M. Hodge, Shirley E. Bowers, Plaintiffs,

and

Equal Employment Opportunity Commission, et al., Plaintiffs-Intervenors,

v.

The CITY OF BUFFALO, a Municipal Corporation; James B. Cunningham, in his capacity as Police Commissioner, City of Buffalo Police Department; Anthony J. Collucci, Paschal C. Rubino, and Michael L. Broderick, in their capacities as Commissioners, City of Buffalo Civil Service; and The New York State Dept. of Civil Service, Defendants.

Thomas J. DOMINO, Plaintiff,

v.

John V. CLARK, New York State Department of Civil Service; Victor S. Bahou, in his capacity as President of the New York State Civil Service Commission and Head of the New York State Department of Civil Service; James G. McFarland, in his capacity as Commissioner of the New York State Civil Service Commission; and Josephine Gambino, in her capacity as Commissioner of the New York Civil Service Commission, Defendants.

Kenneth A. KUCZKA, Plaintiff,

v.

John V. CLARK, New York State Department of Civil Service; Victor S. Bahou, in his capacity as President of the New York State Civil Service Commission and as Head of the New York State Department of Civil Service; James G. McFarland, in his capacity as Commissioner of the New York State Civil Service Commission; and Josephine Gambino, in her capacity as Commissioner of the New York State Civil Service Commission, Defendants.

David R. KARNEY, Plaintiff,

v.

John V. CLARK, New York State Department of Civil Service; Victor S. Bahou, as President of the New York State Civil Service Commission and as Head of the New York State Department of Civil Service; James G. McFarland, as a Commissioner of the New York State Civil Service Commission; and Josephine L. Gambino, as a Commissioner of the New York State Civil Service Commission, and Kenneth J. Braun, as Sheriff of Erie County, Defendants.

Nos. CIV–80–874C, CIV–80–796C, CIV–80–797C and CIV–80–1184C.

United States District Court, W.D. New York.

Oct. 30, 1984.

William A. Price, Buffalo, N.Y., for plaintiffs Hahn, Koch, O'Sullivan, Smith, Walker, Craig, Hodge, Bowers and plaintiffs-intervenors Brozyna, Nowaldy, Tobias, Shaw, Elliott Williams, Willis, Richter, Aston, Berry, Neiman, Bienko, Rindfleisch, Farley, Lema, Michel, Delano, Kerr, James, Betz, DeJesus, Harris, Wagstaff, Hokes, Gladden, Jordan, McDonald, Moore, Abdallah, Mack, Cusella, Shea, Tutuska, Arcara, Malaney, Mullen, Jones, Minor, Feaster, Hutcherson, Motley, Stallworth, Richardson, Ostrowski, Polakiewicz, Moulin, Collier, O'Sullivan and Witaszek.

Cohen, Swados, Wright, Hanifin, Bradford & Brett, Buffalo, N.Y. (Barbara R. Heck James, Buffalo, N.Y., of counsel), for plaintiffs-intervenors Luxenberg, Decker, Wolf, Klipfel, Davis, Emery Williams, M. Schmidt, B. Schmidt, Cotter, Lorenz and Wipperman (Cheryl S. Fisher, Buffalo, N.Y., of counsel), for plaintiffs-intervenors Wehner and McCabe; for plaintiff Domino in CIV–80–796C; and for plaintiff Kuczka in CIV–80–797.

Saperston, Day, Lustig, Gallick, Kirschner & Gaglione, Buffalo, N.Y. (Richard A. Clack, Buffalo, N.Y. of counsel), for plaintiffs-intervenors Hoy, Mikulski and Moore.

Edward A. Pace, Buffalo, N.Y., for plaintiffs-intervenors Clark, Cooper and Quinn.

William R. Hites, Buffalo, N.Y., for plaintiff-intervenor McMahon.

Dubin & Sommerstein, Buffalo, N.Y. (Edwin P. Hunter, Buffalo, N.Y., of counsel), for plaintiffs-intervenors Giacchino and Shea and for plaintiff-intervenor Karney in CIV–80–1184C.

Sargent & Repka, Buffalo, N.Y. (Nicholas J. Sargent, Buffalo, N.Y., of counsel), for plaintiffs-intervenors Dillon and Leone.

Garvey, Magner & Love, Buffalo, N.Y. (Jeffrey L. Taylor, Buffalo, N.Y., of counsel), for plaintiff-intervenor Breitnauer.

E.E.O.C., Buffalo, N.Y. (Saul Krenzel, New York City, of counsel), for plaintiff-intervenor E.E.O.C.

Robert Abrams, Atty. Gen., State of N.Y. (Douglas S. Cream, Asst. N.Y. State Atty. Gen., Buffalo, N.Y., of counsel), for defendant State of N.Y.

John Naples, Corp. Counsel, Buffalo, N.Y. (Peter J. Gerard, Asst. Corp. Counsel, Buffalo, N.Y., of counsel), for defendants City of Buffalo, Cunningham, Collucci, Rubino and Broderick.

Eugene F. Pigott, Jr., Erie County Atty., Buffalo, N.Y. (Robert E. Casey, Asst. County Atty., Buffalo, N.Y., of counsel), for defendant Braun in CIV–80–1184C and for defendant Clark in CIV–80–796C, CIV–80–797C, and CIV–80–1184C.

CURTIN, Chief Judge.

This case involves age discrimination in the hiring of police officers in Buffalo, New York, and other municipalities in the Buffalo area. Section 58(1)(a) of the New York State Civil Service Law provides that no person who is more than 29 years of age

shall be eligible for appointment as a police officer.[1]

The plaintiffs are individuals over the age of 29 whose age disqualifies them from employment in various police departments. Some of the plaintiffs are over 40 years old. These plaintiffs have standing to claim that section 58(1)(a) violates their rights under section 4(a)(1) of the Age Discrimination in Employment Act [ADEA], 29 U.S.C. § 623(a)(1).[2] The remaining plaintiffs are over age 29 but less than age 40. The plaintiffs between the ages of 29 and 40 claim that section 58(1)(a) denies them the equal protection of the laws. Plaintiffs under the age of 40 do not have standing to assert claims under the ADEA, because the act applies only to persons between the ages of 40 and 70.[3] The Equal Employment Opportunity Commission [EEOC] has intervened on behalf of those plaintiffs asserting claims under the ADEA.

The United States Court of Appeals for the Second Circuit has recently held that the presence of a one-house veto clause in the Reorganization Act of 1977, 5 U.S.C. § 901 *et seq.*, invalidates the authority of the EEOC to enforce the ADEA. *Equal Employment Opportunity Commission v.*

*CBS, Inc.*, 743 F.2d 969 (2d Cir.1984). To avoid unnecessary disruption of the many enforcement cases now pending, the court stayed its judgment until December 31, 1984, so that Congress could correct the defect in the statute. Absent such correction, the complaint in that case would be dismissed.

The decision in *EEOC v. CBS* would not require dismissal of the complaint in the present case. Here, three of the original plaintiffs are over 40 years of age. The EEOC participated as an intervenor. This case is still viable without the participation of the EEOC, unlike *EEOC v. CBS*, in which the EEOC was the sole plaintiff. In any event, Congress has passed, and the President has signed into law, H.R. 6225, which has remedied the deficiency in the EEOC's authority to enforce the ADEA.

Critical to the claim under the ADEA is the issue of whether a maximum hiring age of less than 40 is a bona fide occupational qualification [BFOQ] reasonably necessary for the operation of municipal police departments. If age less than 40 is a BFOQ as defined in section 4(f)(1) of the ADEA, 29 U.S.C. § 623(f)(1),[4] then the continued

1. Section 58(1)(a) provides that:
    1. Notwithstanding any other provision of this law or any general, special or local law to the contrary, no person shall be eligible for provisional or permanent appointment in the competitive class of the civil service as a police officer of the capital police force of the state office of general services after June first, nineteen hundred seventy-eight, or as a police officer of any police force, or police department of any county, city, town, village, housing authority or police district unless he shall satisfy the following basic requirements:
    (a) he is not less than twenty nor more than twenty-nine years of age, provided, however, that the time spent on military duty or on terminal leave, not exceeding a total of six years, shall be subtracted from the age of any applicant who has passed his twenty-ninth birthday as provided in subdivision ten-a of section two hundred forty-three of the military law, and provided further, however, that prior to June thirtieth, nineteen hundred seventy-two, the maximum qualifying age provided hereunder shall be determined as of the date when the applicant takes the written examination.

2. Section 4(a)(1), 29 U.S.C. § 623(a)(1), provides as follows:
    (a) It shall be unlawful for an employer—
    (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

3. Although section 58(1)(a) requires that prospective appointees be less than 29, only persons between ages 40 and 70 are protected by the ADEA. 29 U.S.C. § 631(a). Therefore, for purposes of the ADEA, the court must consider the age limit only at age forty. *See, Murnane v. American Airlines, Inc.*, 667 F.2d 98 (D.C.Cir. 1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982).

4. Section 4(f)(1) provides that:
    It shall not be unlawful for an employer, employment agency, or labor organization—
    (1) to take any action otherwise prohibited under sections (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or

enforcement of section 58(1)(a) does not violate the ADEA.

The court has heard the trial testimony of experts in the fields of medicine and law enforcement. The court's decision is therefore based upon a fully developed record of testimony and exhibits. Upon review of this record and the applicable law, I conclude that the enforcement of section 58(1)(a) does not deny plaintiffs the equal protection of the laws. However, I find that section 58(1)(a) violates the rights to which the plaintiffs over age 40 are entitled under the ADEA.

The court has granted preliminary relief to the eight original plaintiffs in this case. This relief has been extended to the more than 70 persons who have since intervened as plaintiffs. Under the terms of the orders granting such relief, the defendants have been enjoined from enforcing section 58(1)(a). Accordingly, the intervenors who have written the competitive examinations necessary to become police officers have been placed upon the eligibility lists from which officers are appointed. Some have been appointed and have taken jobs as police officers in spite of not meeting the age requirement.

In another procedural matter, the court has consolidated the cases of *Domino v. Clark*, CIV–80–796C; *Kuczka v. Clark*, CIV–80–797C; and *Karney v. Clark*, CIV–80–1184C, with the present action.

The following are the court's findings of fact and conclusions of law.

## I. EQUAL PROTECTION

■ Section 58(1)(a) concerns eligibility for government employment and discriminates against persons over age 29. Age classifications of this sort are not "suspect," and the right to government employment has been held not to be fundamental. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). If this case involved either a suspect classification or a fundamental right, then the court would be

required to analyze section 58(1)(a) under the "strict scrutiny" standard, a difficult test which few statutes can pass. *Bernal v. Fainter*, —— U.S. ——, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984). However, the applicable legal standard in this case is a more relaxed standard which requires only that the statute be rationally related to a legitimate state interest. *Massachusetts Board of Retirement v. Murgia, supra.*

■ Courts are reluctant to overturn state statutes in cases where suspect classifications and fundamental rights are not involved and where the "rationality" test applies. *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). The evidence in the present case clearly shows that the facts upon which the age classification is apparently based could reasonably be conceived to be true. I also find that the statute is reasonably related to the legitimate goal of maintaining a safe and efficient police department. I must therefore conclude that section 58(1)(a) does not violate the equal protection clause.

Section 58(1)(a) has been the subject of equal protection analysis in at least four cases decided by federal district courts. The statute was upheld in three of these cases. *See, Tober v. Scofield*, CIV–82–51T (W.D.N.Y. December 29, 1983); *Sica v. County of Nassau*, CIV–81–3497 (E.D.N.Y. March 9, 1982); *Colon, et al. v. New York*, 535 F.Supp. 1108 (S.D.N.Y.1982). Section 58(1)(a) was held to be unconstitutional in *McMahon v. Barclay*, 510 F.Supp. 1114 (S.D.N.Y.1981), a case decided before the decisions were handed down in the other three cases. Each of the aforementioned cases was decided on a motion for summary judgment. The present case is the first in which an extensive record was developed.

There are some apparent incongruities in section 58(1)(a) which lend surface support to the argument that it is not rationally related to the State's interest. The statute generally forbids hiring persons older than 29, but it makes exceptions in certain cases.

where the differentiation is based on reason-   able factors other than age.

One important exception is for persons over age 29 who have spent time in military service. The time spent in military service, not exceeding a period of six years, may be subtracted from the ages of these applicants. Civil Service Law § 58(1)(a). Another exception applies to police departments which experience "aggravated recruitment difficulties" which cause personnel shortages. The age limitation may be raised temporarily to 35 under such circumstances. Civil Service Law § 58, subd. 1–a.

The evidence in the present case indicates that the number of persons appointed under the exception for persons in military service is quite small. As for the exception concerning departments with "aggravated recruitment difficulties," this is an emergency provision which is not at all inconsistent with the defendants' contention that the appointment of young men and women is necessary for the operation of efficient and safe police departments.

The law enforcement experts who testified for the defendant State of New York all agreed that the age limit for appointing police officers should remain as it is. Charles F. Peterson, Deputy Commissioner of the Suffolk County Police Department, testified that younger men are easier to train for police work. [Tr. V, 71.] William G. McMahon, Deputy Commissioner of the New York State Division of Criminal Justice Services, testified that younger appointees are more highly motivated and better able to perform difficult assignments. [Tr. IV, 36.] There was also testimony to the effect that the average "street life" of a police officer was about ten years [Tr. IV, 54], and the medical evidence uniformly pointed to the plain fact that physical capabilities tend to decline somewhat after age 29. This evidence might suggest that the most capable and efficient police force is composed of officers who are hired at a young age and spend their best years on the force while in peak physical condition.

The issue before the court on the equal protection question is not whether the court believes that these facts and inferences are true. The court notes that this inquiry is vastly different from the analysis required by the plaintiffs' claim under the ADEA. As we shall see, the ADEA claim requires a far more searching scrutiny of the evidence. As for the equal protection claim, the question is whether the defendants' evidence could "reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 440 U.S. at 111, 99 S.Ct. at 949. The plaintiffs' burden is to convince the court that these facts cannot reasonably be believed. This burden is demanding, *Colon v. City of New York*, 535 F.Supp. at 1113, and the plaintiffs have failed to bear it in this case.

The facts upon which the age classification is apparently based are believable. Taken as true, they would indicate that the age requirement of section 58(1)(a) is rationally related to the goal of maintaining an efficient and safe police department. Therefore, section 58(1)(a) does not deny the plaintiffs the equal protection of the laws. *Accord, Arritt v. Grisell*, 567 F.2d 1267 (4th Cir.1977) (West Virginia statute prohibiting appointment of persons over age 35 to city police departments is constitutional).

## II. ADEA

### A. *Constitutionality As Applied to State and Local Governments*

■ Until 1974, the substantive provisions of the ADEA did not apply to state and local governments. However, the Act was then amended to bring governmental entities within its scope. 29 U.S.C. § 630(b)(2). The State of New York has raised the threshold question of whether Congress acted constitutionally when it broadened the scope of the ADEA in this fashion. The State argues that the application of the ADEA to state and local governments violates the tenth amendment, citing *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). This argument need not detain us long. In *Equal Employment Opportunity Commission v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), the Supreme Court held that the tenth amend-

ment did not preclude the application of the ADEA to a Wyoming law which required that game wardens retire at age 55. The Court noted that the great majority of courts had upheld the 1974 amendment to the ADEA. *Id.* 103 S.Ct. at 1059 and n.6. Since the Court's decision in *Wyoming,* many courts have upheld the application of the ADEA to state and local governments in cases similar to the case at bar. *See, e.g., Equal Employment Opportunity Commission v. City of Altoona, Pennsylvania,* 723 F.2d 4 (3d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2386, 81 L.Ed.2d 344 (1984); *Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694 (1st Cir. 1983); *Equal Employment Opportunity Commission v. Los Angeles County,* 706 F.2d 1039 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *E.E.O.C. v. County of Allegheny,* 705 F.2d 679 (3d Cir.1983); *Mahoney v. Trabucco,* 574 F.Supp. 955 (D.Mass.1983), *rev'd on other grounds,* 738 F.2d 35 (1st Cir.1984). Accordingly, I hold that the tenth amendment does not bar the application of the ADEA to state and local governments in this case.

## B. *The BFOQ Defense*

Since section 58(1)(a) expressly discriminates against prospective appointees to municipal police departments on the basis of age, there is no question as to whether the plaintiffs have stated a *prima facie* case under the ADEA. Rather, the question is whether the age restriction is defensible as a BFOQ. *Maki v. Commissioner of Education of State of New York,* 568 F.Supp. 252, 254 (N.D.N.Y.1983); *EEOC v. County of Los Angeles,* 526 F.Supp. 1135, 1138 (C.D.Cal.1981), *aff'd,* 706 F.2d 1039, *cert. denied,* —— U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

■ "The BFOQ is an extremely narrow exception to the general prohibition against age discrimination." *Air Line Pilots Asso-*

ciation, International v. Trans World Airlines, 713 F.2d 940, 951 (2d Cir.1983), *cert. granted,* —— U.S. ——, 104 S.Ct. 1412, 79 L.Ed.2d 739 (1984), *citing Orzel v. City of Wauwatosa Fire Dep't,* 697 F.2d 743, 748 (7th Cir.1983). To establish the BFOQ defense, the employer must meet the requirements set forth in *Usery v. Tamiami Trail Tours,* 531 F.2d 224 (5th Cir.1976).[5] The employer must show 1) that the job qualifications are reasonably necessary to the essential operation of the business and 2) that there is a factual basis for believing that all or substantially all of the persons within the class protected by the ADEA would be unable to perform the job effectively and safely, *or* that it is impossible or impracticable to determine job fitness on an individualized basis. *Id.,* at 235–36; *EEOC v. County of Los Angeles,* 706 F.2d at 1042–43; *Orzel v. City of Wauwatosa Fire Dep't,* 697 F.2d at 753; *E.E.O.C. v. City of St. Paul,* 671 F.2d 1162, 1166 (8th Cir. 1982).

It is clear that the safety of others is part of the essence of police work. Many courts have stated that the presence of a safety factor reduces the level of proof necessary to establish a BFOQ. *See, e.g., Orzel v. City of Wauwatosa Fire Dep't,* 697 F.2d at 755; *Tuohy v. Ford Motor Company,* 675 F.2d 842, 845 (6th Cir.1982); *E.E.O.C. v. Santa Barbara,* 666 F.2d 373, 377 (9th Cir.1982). However, this does not relieve the defendant of its burden of establishing both elements of the BFOQ defense; it only means that establishing the defense will normally be less difficult when safety is part of the essence of the defendant's business.

It should also be noted that third-party safety is not "essential" to all businesses in precisely the same way. In *Tamiami,* the Fifth Circuit noted that "[t]he greater the safety factor, measured by the likelihood of harm and the probable severity of that

---

5. The State argues that the court should apply the less stringent test stated in *Hodgson v. Greyhound Lines, Inc.,* 499 F.2d 859 (7th Cir.1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975). However, in *Orzel v. City of*

*Wauwatosa Fire Dep't,* 697 F.2d 743 (1983), the Seventh Circuit rejected what it called an "expansive" reading of *Greyhound* and viewed *Greyhound* as being consistent with the test formulated by the Fifth Circuit in *Tamiami.*

harm in case of an accident, the more stringent may be the job qualifications." 531 F.2d at 236. Thus, the district court in *E.E.O.C. v. County of Los Angeles* noted that the safety of large numbers of persons is not continually dependent upon the "moment to moment physical vitality" of a police officer. 526 F.Supp. at 1141. This was in marked contrast to the *Tamiami* case, which involved intercity bus drivers. The nature of the safety factor differs widely among various types of employment. *Aaron v. Davis*, 414 F.Supp. 453, 462 (E.D.Ark.1976).

The first element of the BFOQ test is concerned with the relationship between the underlying job qualifications and the *essence* of the business. Here, the essence of the business is "the operation of an efficient police department for the protection of the public," and the primary function of a police officer is "to protect persons and property and to maintain law and order." *Arritt v. Grisell*, 567 F.2d at 1271, 1272. The first element of the BFOQ test does not present any difficulty in the present case. This is not a case like *Diaz v. Pan American World Airways*, 442 F.2d 385 (5th Cir.1971), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (sex discrimination in employment as flight cabin attendants), where the essence of the job was disputed. The parties here are in basic agreement about what a police officer's duties are, and they agree that becoming a police officer requires good physical conditioning.

The plaintiffs do not attack the basic police officer job qualifications. Rather, they contend that there is no factual basis for believing that all or substantially all persons over age 40 are unable to meet these job qualifications and perform the job safely and effectively. They also contend that it is possible and practicable to determine job fitness on an individualized basis. These two contentions are the alternative prongs of the second element in the BFOQ standard.

The court finds that the defendants have not sustained their burden of proving that all or substantially all persons over age 40 could not perform the duties of a police officer safely and effectively. Several witnesses experienced in law enforcement testified for the State. All of them believed that the present age limit should be retained. However, none of these witnesses stated that all or nearly all persons over age 40 could not perform the duties of a police officer.

William G. McMahon, Deputy Commissioner of the New York State Division of Criminal Justice Services, acknowledged that there are officers in their forties and fifties who can outperform patrolmen who are in their twenties and thirties [Tr. IV, pp. 54–55]. Charles F. Peterson, Deputy Police Commissioner of the Suffolk County Police Department, stated that, although the body declines after age 40, he does not believe that there are physical traits possessed by the class of persons over 40 which preclude this class from performing patrol officer work. He noted that in some cases, officers over 40 do outstanding work. [Tr. V, pp. 116–118.]

However, the defendants' law enforcement experts sharply criticized the work of policemen who are in their forties. Deputy Commissioner Peterson said that older officers tend not to be "self starters," whereas younger officers are highly motivated. He also testified that appointees should be altruistic and that altruism declines with age. [Tr. V, pp. 69, 88–89.] Deputy Commissioner McMahon stated that younger officers are better able to do the more difficult assignments. He agreed that they are more highly motivated. [Tr. V, pp. 15–16.]

The law enforcement experts also testified that officers over 40 tend not to recover from injuries as quickly as younger officers. [Tr. V, p. 87.] Another criticism was that older officers were worse at handling emergency situations. Chief Oliva explained that a typical emergency would involve a civilian with a heart attack or other injury. He also spoke of accident prevention and traffic enforcement. Asked if an officer's "productivity" in these areas decreased with age, Chief Oliva answered:

Yes, I think summarily from the top of my head I can see, you know, an avoidance of traffic enforcement, perhaps a nonchalant performance of his duties in terms of cultivating intelligence on the street, which is very critical in our operations, developing an ability to ignore certain things when perhaps they should be attended to[.] [T]hat may come with experience or it may come with age, I am not really sure, but it becomes ... apparent with the older officer.

[Tr. V, pp. 32–33.]

Deputy Commissioner McMahon also testified that younger officers were better at handling "crisis intervention" situations. He explained that these include such interpersonal conflicts as domestic violence, accidents, and robberies. A "team effort" is often required, and the safety of civilians and other officers sometimes depends upon one officer's performance. [Tr. IV, pp. 32–35.] McMahon then testified that the age restriction should be retained because "the younger the police officer you have, the more highly motivated that person is and the more able he is to perform in the difficult assignments." [Tr. IV, p. 36.]

McMahon's testimony raised another important point: the more physically able an officer is, the less likely he or she will have to resort to deadly physical force. [Tr. IV, p. 35.] A person's physical capacities tend to decline with age, and of course, the use of physical force should be minimized.

There are several factors which severely limit the probative force this evidence has in demonstrating that substantially all persons over age 40 cannot be safe and effective police officers. One factor has already been noted: officers over age 40 now serving in various police departments are doing competent police work. In some cases, their work is excellent. More than half of Buffalo's 797 police officers were over age 40 as of February 19, 1982. One hundred

seventy-six of these are over age 50. [Stipulation, Item 104, p. 2.]

A second factor detracting from the weight of the opinions offered by the State's law enforcement experts is that the decline in performance appears to be due in large part to job tenure rather than age. Deputy Commissioner McMahon acknowledged that a decline in an officer's motivation could be attributed to his reaching the end of his seven-to-ten-year "street life." [Tr. IV, p. 53.] Deputy Commissioner Peterson said that altruism and enthusiasm decrease with age and that the older officers' performances were negatively affected as a result. However, age was only one factor he cited as a cause of the decline in an officer's enthusiasm. Peterson's testimony indicated that a police officer's having "seen it all before" is at least part of the reason why his enthusiasm waned. [Tr. V, p. 88.] Peterson explicitly stated: "There is no doubt that as a man goes through police work he loses some of his altruism and some of his enthusiasm for it." [Tr. V, p. 138.][6]

Chief Oliva, although he never changed his mind about the need for the hiring age limit, responded affirmatively when the court asked him if he believed that an officer's enthusiasm for the job decreases as he spends more time with the department. Chief Oliva also stated that there comes a "tenure time .. when they become ring wise." He added that loss of enthusiasm "is an inherent quality that develops with an individual who becomes seasoned." Finally, when asked about appointees who were hired while in their thirties under the exception for military service, Chief Oliva stated that these officers "have been satisfactory employees." [Tr. V, pp. 50–55.]

On balance, the testimony of the defendants' law enforcement experts has failed to persuade the court that all or substantially all persons over age 40 are either physically or emotionally unfit to perform the

---

**6.** Peterson made specific reference to the effect an officer's familiarity with the criminal justice system has upon his attitude. Familiarity with plea bargaining and absentee witnesses were two cynicism-engendering factors that were noted. Suppression of evidence was another. [Tr. V, pp. 69, 89.]

duties of a police officer safely and effectively. The perceived worsening of attitude appears to be induced much more by tenure than by age. I note in this connection that nearly all of the "older" officers upon whose performances this testimony was based were hired while in their twenties. They had been police officers more than 10 years before turning 40. I also note one expert's observation that 88 percent of all police officers fail to advance to the rank of sergeant. Failure to advance to higher ranks is also a major factor contributing to the decline in an officer's enthusiasm for the job. [Tr. V, p. 67.]

As previously noted, the law enforcement experts formed their opinions by observing officers who had served several years before turning 40. Each expert conceded that some officers over 40 have enough physical ability to do competent work. This is in spite of the fact that an officer's physical condition is not closely scrutinized after he or she is appointed. One expert even stated that the older officers who do not seek non-patrol duty are usually in better shape than policemen over ten years younger. [Tr. V, p. 117.]

The basic thrust of this expert testimony was only that there is a *tendency* toward physical decline in older officers. No one suggested that all or nearly all officers over age 40 actually deteriorate to the point of physical incompetence. This evidence cannot support the conclusion that all or nearly all persons over 40 who have not been subjected to the strain of police work are unable to become police officers.

The State also introduced statistical evidence for the purpose of showing that substantially all persons hired at or beyond age 40 could not be effective police officers. Roderick J. Bartell is a director of a management consultant firm that does research concerning law enforcement and criminal justice agencies. Bartell coordinated a study of the New York Housing Authority Police Department and the New York City Police Department. The data for this study was collected in 1980, and a report was issued in 1981. [Defendants'

Exhibit 11, hereinafter referred to as DX 11.]

The most pertinent section of the report was concerned with the relationship between age and the level of performance achieved by New York City Police Officers. [DX 11, pp. 31, *et seq.*] The officers whose performances were studied were all patrolmen. The work product of superior officers and officers on special assignments was not considered. [DX 11, p. 9.]

The performance of police officers was evaluated in terms of number of arrests. Number of arrests was chosen as the indicator of officer-effectiveness, because the authority to make arrests is what distinguishes police work from other occupations. [DX 11, p. 31.] In a population of 16,536 male patrol officers, 139,000 arrests were made. This works out to an average of 8.4 arrests per officer per year. The Bartell study revealed that the mean number of arrests made by officers hired between ages 21 and 25 was 8.7. This is slightly higher than the average for all officers. The mean for those hired between ages 26 and 30 was 7.7. The figure for 31 to 35-year-old hirees was 6.8. These figures show that, as we move from one five-year age bracket to the next, the number of arrests per year will decrease by about one. Officers hired after age 25 fall below the 8.4 overall average. [DX 11, pp. 40–41.]

Bartell also studied the relationship between arrests per year and an officer's chronological age. The mean number of arrests per year was highest (about 12.5) for officers between the ages of 31 and 35. Next highest were the officers in the 26–30 and 36–40 age brackets. The mean for both brackets was between 10 and 11 arrests per year, with the 26–30 group performing slightly better. [DX 11, p. 43.] Arrest totals dropped off significantly in the five-year age brackets beyond the 36–40 group. In the five five-year age brackets between the ages of 41 and 65, the mean number of arrests ranged from about 7.5 for the 41–45 bracket to 3.5 for officers between the ages of 61 and 65.

The relationship between job tenure and arrests per year was also studied. Officers with between four and nine years of experience apparently made significantly more arrests than officers in any of the other age brackets. The average for officers with between 13 and 15 years on the force was about 8.5 per year. The tenure group with the highest figure was the 4–6-year group, whose average number of arrests was slightly more than 13. [DX 11, p. 44.]

The court believes that the probative value of the Bartell study is severely limited by the narrowness of its focus. The study was effective in showing a link between age and arrests, but there was other evidence in the case which showed that arresting suspected criminals constitutes only a very small portion of a police officer's daily routine. Mr. Bartell conceded that less than 1 percent of the time a police officer spends on patrol duty is spent on criminal events worthy of the officer's attention. This factor is called "probability of apprehension and detection." The rest of an officer's time is spent doing other things, which Bartell's report concededly did not address.

Bartell also agreed that making arrests was not the only effective way of handling a volatile situation. Diffusing such incidents by calming down the participants might not result in an arrest, but it would be an effective means of bringing an incident under control.[7] However, effective police work of this nature was not measured in the Bartell study. [Tr. IV, pp. 159–175.] Mr. Bartell explained that breaking down arrests into felony and misdemeanor categories partially compensated for this defect in the report. There is a negative correlation between age increase and the number of felony arrests. However, this does not resolve the problem inherent in the study's narrow focus.

The report also did not measure the effect that precinct location and work shift had upon the arrest figures. The incidence of crime differs from one shift to another. Deputy Commissioner McMahon noted that the shift from 4 p.m. to 12 a.m. has the highest level of criminal activity. He also noted that officers with more tenure can successfully bid upon the "safer" shifts. [Tr. IV, p. 68.] This would reduce an older officer's probability of apprehension and detection. An officer first appointed at age 40 would not have the seniority to successfully bid upon the most sought-after work shifts.

I will not speculate upon what a more complete analysis would show. However, this analysis does not persuade me that individuals hired after age 40 could not perform the duties of a police officer safely and effectively.

The medical evidence in this case is relevant to both of the alternative prongs in the second element of the BFOQ test. I find that, by itself and in combination with the statistical and other expert testimony, the medical evidence does not show that all or substantially all persons over age 40 cannot perform the duties of a police officer safely and effectively.

Much of the medical evidence related to the degree of accuracy with which the existence of heart disease can be recognized. However, there was also considerable testimony concerning the ability of persons over age 40 to do police work. The physical requirements for the job include speed, muscle strength, power, limited body fat, and good health. [Tr. II, pp. 122–23.] The peak years for these physical requirements are the twenties or early thirties in most individuals.

However, the evidence showed that a significant percentage of persons over age 40 could perform at the level of the average person in his or her twenties. For example, the average maximum oxygen uptake level for men between the ages of 20 and 29 is about 39.1 milliliters per kilogram per minute [ml/kg-min.]. Dr. Michael Pollock, Director of Cardiac Rehabilitation and

---

7. Deputy Commissioner McMahon testified that skill in diffusing a tense situation is the most effective and desirable means of control. Arrests might not result when such methods are used. [Tr. IV, pp. 69–70.]

the Schuman Performance Laboratory at the University of Wisconsin, participated in a study which measured the correlation between age and fitness. Dr. Pollock was a most credible witness. He testified that about 45 percent of the males between the ages of 30 and 39 could achieve the 39.1 ml/kg-min level for oxygen uptake. Thirty-five percent of the persons between ages 40 and 49 and 20 percent of those between ages 50 and 59 could match the 39.1 figure. With respect to body fat, the average male in his twenties had a level of 20.1 percent. About 35 percent of the males in their forties attained the average for men 20 years younger. About 30 percent of the males in their fifties had body fat levels equivalent to the 20.1 percent average for men in their twenties. [Tr. II, pp. 47–52; PX 25.]

Persons over age 40 also compared favorably with younger men in terms of strength.[8] Dr. Pollock noted that strength declines somewhat with age but that the decline is very slight before age 44. The decline is more perceptible beyond age 44, but about 35 percent of the persons in the 45–49 age category have strength equal to that of the average man in his twenties. Between 15 and 20 percent of all men in their fifties are as strong as the average man in his twenties. [Tr. II, pp. 63–64.]

Age is a factor in physical conditioning which cannot be controlled. However, the evidence did not indicate that it is a factor which debilitates all or substantially all persons over age 40 to the point of being unable to do police work. Factors such as heredity differ widely among individuals and may or may not be advantageous. Other factors, such as diet, discipline, exercise, and life style, have great impact upon health and are controllable. Dr. Pollock testified that if a 40-year-old man whose physical characteristics were similar to those of an average man in his twenties were hired as a police officer, he could probably continue to perform the job at age 50. This assumes that this individual

would continue to take care of himself. [Tr. II, p. 69.]

The court recognizes that this particular testimony is somewhat speculative. However, many individuals appointed as young men remain police officers well beyond age 40. A police department has very little control over the way officers hired in their twenties maintain their physical conditioning when, as veterans, they reach their forties. [Tr. V, pp. 100–03.] This is sometimes the result of provisions in collective bargaining agreements. On the other hand, the physical condition of an individual appointed at age 40 would be subject to scrutiny at the time of appointment and during a probationary period thereafter. It is reasonable to infer that if persons over age 40 can *remain* police officers after several years of being relatively unsupervised in matters of physical conditioning, then fit persons over age 40 can *become* police officers and perform officers' duties for a considerable length of time. I find that the defendants have failed to prove that all or substantially all persons over age 40 cannot perform the duties of a police officer safely and effectively.

An employer can also establish the BFOQ defense if it is able to prove that disqualifying physical traits are present in persons over age 40 and cannot be identified practicably and reliably by means other than automatic exclusion based upon age. The parties' medical evidence on this point was almost entirely directed at the degree of certainty with which latent heart disease can be identified and the ability to predict the occurrence of a heart attack within five or six years.

Dr. Samuel M. Fox III is a cardiologist who testified for the plaintiff-intervenor EEOC. His testimony was most credible and persuasive. He noted that there are certain factors which, if present, increase the probability that an individual has or will later have coronary artery disease. The presence of this disease in prospective officers is of particular concern, because it

8. On the subject of strength, Dr. Pollock was referring to a study conducted by Henry J. Montoye and Donald E. Lamphiear [PX 26]. The strength measured was grip and arm strength.

is a leading cause of death and appears to be more common in police officers than in the population generally.

The "risk factors" include cigarette smoking, high blood pressure, blood cholesterol, angina, family history, obesity, diabetes mellitus, sex, and age. [Tr. I, pp. 20, 40, 129.] Sex, age, and family history are the only risk factors which can never be controlled. Women are less susceptible to coronary artery disease than men, and the risk of the disease increases with age. [Tr. I, p. 110.] Family history is not controllable, but it is not always a clear indicator. Family members who previously had coronary artery disease might have had it in part because of tobacco use or obesity, factors which need not affect all family members. Use of cigarettes nearly doubles a person's chances of getting coronary artery disease. [Tr. I, p. 130, 44.]

Dr. Fox testified that the existence or later onset of coronary artery disease can be predicted upon an analysis of the risk factors. All of the risk factors are easily detectable by routine medical procedures no more invasive than drawing a small blood sample. Dr. Fox stated that the predictive value of the risk factor analysis is "highly useful, and particularly effective in screening personnel for service in various occupations." [Tr. I, pp. 21–22.]

Dr. Fox qualified his testimony about risk factor analysis with the observation that it lacks some additional information an examiner would like to have. This additional information can be obtained as a result of a symptom limited exercise stress test. The stress test involves an examination of an individual during and after exercising at a level beyond which he cannot go. This test is non-invasive. [Tr. I, p. 23.]

Dr. Fox testified that it is unnecessary to administer the stress test to persons whose pretest likelihood of having coronary artery disease is less than 8–10 percent. He said that a low reading after the risk factor analysis would "make more sophisticated studies unnecessary." [Tr. I, p. 57.] He went on to state that if a person's pretest probability for coronary artery disease was below 10 percent, a successful stress test will have a negative predictive value of 97 percent. This means that there is only a three percent post-test probability that the person has coronary artery disease or will develop it within six years. In the case of a person having a 20 percent pretest probability, the stress test will have a 90 percent negative predictive value. [Tr. I, pp. 60–61.]

Dr. Walter Zimdahl is a cardiologist who testified for the defendants. Dr. Zimdahl suggested that all persons 35 years old and over should be given a stress test if they desire to become police officers. [Tr. VI, pp. 23–23.] He agreed with Dr. Fox's general conclusion that the stress test is a useful device for identifying the existence of coronary artery disease and predicting its onset in the near future. [Tr. VI, pp. 17–18.] Dr. Zimdahl would administer the test to every applicant over age 35, whereas Dr. Fox would administer it only to those who have a pretest probability beyond the 8–10 percent range.

Dr. Zimdahl noted that coronary artery disease can appear very suddenly—often in the form of a fatal heart attack in persons who had previously been free of symptoms. Still, he testified that 80 percent of all symptomatic males over age 40 who have *each* of the five most important risk factors do *not* have coronary artery disease. Dr. Zimdahl listed hypertension, blood cholesterol leve, electro-cardiographic changes, cigarette smoking, and heredity as the five most critical risk factors.

Evidently, the risk of coronary artery disease increases with age, although age is only a secondary risk factor. [Tr. VI, p. 54.] However, the evidence also shows that an analysis of the risk factors can give a very useful estimate of whether or not an individual has the disease. The risk factor analysis is not invasive or impractical to administer.

On the basis of a risk factor analysis, one is able to determine whether more sophisticated testing is required. The evidence showed that a candidate can take a stress test and afterwards be more than 90 per-

cent certain that he or she is free of coronary artery disease. The cost of this test is about $215.00, but not all candidates would need to take it. A stress test is such a useful indicator of cardiovascular fitness that anyone (even if under age 40) who fails it should not become a police officer. [Tr. VI, pp. 23–24.]

Physically unqualified persons over age 40 can be identified with enough certainty that it cannot be said that age 40 at the time of hiring is a BFOQ for the job of police officer. The defendants have therefore failed to carry their burden of establishing this defense. It is true that the work of a police officer can be very strenuous at times. However, the evidence in this case shows that a significant amount of persons over age 40 can handle the rigors of police work, and those who cannot handle it can be identified with reasonable certainty.

In *E.E.O.C. v. Los Angeles County*, 706 F.2d 1039, *cert. denied*, — U.S. —, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984), the court held that age 35 at hire is not a BFOQ for deputy sheriffs. In that case, the trial judge found no difference in the evidence between age 35 and age 40. *See* 526 F.Supp. 1135, 1139 n. 4. A similar result was reached in *E.E.O.C. v. County of Allegheny*, 705 F.2d 679, where the court held that persons above age 35 could not be prevented from writing the police examination. However, a different result was reached in *E.E.O.C. v. Missouri State Highway Patrol*, 555 F.Supp. 97 (W.D.Mo. 1982), which upheld an age 35 hiring limit for highway patrol applicants.

In *Mahoney v. Trabucco, supra*, the plaintiff at the district court level successfully challenged a statute which mandated retirement at age 50 for members of the Massachusetts State Police. The plaintiff was an officer who had worked as a telecommunications specialist since 1969. The only medical evidence in the case was the testimony of the defendant's medical experts. One expert testified that substantially all persons over age 50 were unable to perform the job of police officer safely

and effectively. Another testified that sufferers of asymptomatic coronary artery disease could be identified with only 1 percent accuracy. 574 F.Supp. at 960.

The plaintiff did not call any experts of his own to rebut this testimony. Accordingly, the district court stated that it would find that age less than 50 is a BFOQ for the general duties of a police officer. *Id.* However, the court specifically noted that its finding was only "a judgment on the evidence presented at trial" and that "individual cases are likely to turn on the medical evidence presented at trial." *Id.* at 960 n. 1.

The plaintiff in *Mahoney* prevailed at trial only because the district court accepted an interpretation of the ADEA which distinguished between the duties of policemen generally and the plaintiff's particular job assignment. The court noted that the plaintiff's particular job was very light. For that reason, the district court enjoined the defendants from applying the age 50 retirement mandate against the plaintiff.

The United States Court of Appeals for the First Circuit reversed. The court held that it was error to focus upon specific job requirements rather than the general duties of uniformed officers. The First Circuit's opinion is devoted almost entirely to that issue. It was noted that the plaintiff could have been reassigned to more strenuous duties at any time. Upon deciding that the correct view of the ADEA required focusing upon the duties of police officers generally, the Court of Appeals was constrained to accept the uncontradicted testimony of the defendants' medical experts that substantially all persons over age 50 could not handle a police officer's duties.

The instant case is vastly different. Here, the plaintiffs did not employ the risky strategy of preferring to rely upon a particular statutory interpretation instead of producing their own medical evidence. On the contrary, the plaintiffs in this case offered persuasive evidence that a significant number of persons over age 40 could

become police officers and perform regular police work effectively.

In another recent case, the United States Court of Appeals for the Fourth Circuit reversed a district court's finding that age 60 was not a BFOQ for the job of firefighter in the City of Baltimore. *Johnson v. Mayor and City of Baltimore*, 731 F.2d 209 (4th Cir.1984). That case also involved a maximum age of retirement, unlike the instant case which involves age at hire. Interestingly, the Fourth Circuit noted (albeit in an equal protection context, discussing their decision in *Arritt v. Grisell, supra*) that it would be irrational to treat a 40-year old applicant for a police officer appointment different than all police officers 40 years old or older. 731 F.2d at 214 n. 16.

The court is aware of the fact that public safety is an important element in police work. Arbitrary age limits become more justifiable as the likelihood of harm and the degree of harm likely to result increase. *Aaron v. Davis*, 414 F.Supp. at 461. The evidence here did not indicate that hiring persons over 40 would put the public or other police officers at an appreciably greater risk. Persons with coronary artery disease can be identified or cleared with great certainty, and the consequence of a mistake was not shown to be at all likely to result in harm to the public. Many persons over age 40 are patrolmen doing the same work new appointees do, and at no unacceptable risk to the public.

This case is distinguishable from *Tamiami*, where a maximum hiring age of 35 for intercity bus drivers was upheld. There was evidence in that case that work done by newly appointed drivers was far more strenuous than the work done by veterans. Veteran drivers testified that they could not do the more strenuous jobs and that nearly everyone opted out of those assignments when his seniority permitted. 531 F.2d at 238. The same is not true here. Persons over age 40 are doing patrol work safely and effectively.

The nature of police work is also different. Persons operating vehicles carrying many passengers continually have the safety of many people in their hands. A very slight physical defect of any kind could easily cause serious harm to many persons. Police work can be very strenuous, but the nature of the work does not require absolute certainty in screening applicants. *See E.E.O.C. v. Los Angeles County*, 526 F.Supp. 1135; *cf. Johnson v. Mayor and City Council of Baltimore*, 515 F.Supp. 1287 (D.Md.1981); *Aaron v. Davis*, 414 F.Supp. 453. The court finds that unfit applicants can be screened out with enough certainty to accommodate the public's need for a safe and efficient police department.

■ An employer's desire to have the most cost-effective work force cannot justify age discrimination where age is not a BFOQ. Although it is reasonable to believe that persons hired younger will work longer and therefore be a better "investment", "economic considerations ... cannot be the basis of a BFOQ." *Smallwood v. United Air Lines, Inc.*, 661 F.2d 303 (4th Cir.1981), *cert. denied*, 456 U.S. 1007, 102 S.Ct. 2299, 73 L.Ed.2d 1302 (1982).

■ For the foregoing reasons, I conclude that age 40 at hire is not a BFOQ. Section 58(1)(a) is therefore contrary to the ADEA. Accordingly, the defendants are hereby enjoined from enforcing section 58(1)(a).

The court notes that this order does not require lowering the standards for prospective police officers. These standards are not questioned. Today's order means only that the defendants cannot disqualify a candidate *solely* because of his or her age. If a candidate is unfit, his or her employment application can and ought to be rejected. Today's order works no change in the applicable physical standards; it only means that older persons cannot be foreclosed from competing under those standards for positions in municipal police departments. Moreover, nothing in this decision and order prevents the imposition of an entry level age limit at some age greater than 40.

**954**

## III. VALIDITY OF SECTION 58(1)(a) UNDER STATE LAW

Some of the plaintiffs claim that section 58(1)(a) is invalid under applicable New York State law. This argument was rejected in *Sica v. County of Nassau*, CIV–81–3497, *supra*, where Judge Pratt held that a New York court would uphold the statute under state law. In *Figueroa v. Bronstein*, 38 N.Y.2d 533 (1976), the New York State Court of Appeals upheld a provision which set at 32 the maximum age for appointment as a correctional officer. In *Knapp v. Monroe County Civil Service Commission*, 77 A.D.2d 817, 437 N.Y.S.2d 136 (4th Dept.1980), the court held that section 58(1)(a) does not violate the federal or state constitutions or the age discrimination provisions of the Human Rights Law (N.Y.Exec. Law § 296 subd. 3–a). Accordingly, I hold that the pendent state law claims in this case must be dismissed.

## IV. CONCLUSION

Section 58(1)(a) discriminates against individuals on the basis of age. The statute does not violate the equal protection clause of the fourteenth amendment or any provision of State law.

However, section 58(1)(a) violates the rights of the plaintiffs in this case who are over 40 years old and have standing to assert a claim under the ADEA. Plaintiffs Koch, Smith, and Walker in CIV–80–874C are in this category, the latter two having reached age 40 during the pendency of this action.

The other plaintiffs in CIV–80–874C and the persons who were permitted to intervene in that action have not reached age 40 and did not have standing to assert claims under the ADEA. Their only viable claims were the equal protection and state law claims, which are dismissed for the reasons previously stated.

Thus, the complaint in CIV–80–874C must be dismissed as to plaintiffs Hahn, O'Sullivan, Craig, Hodge, and Bowers. The complaints in intervention in CIV–80–

874C, except that of the EEOC, must also be dismissed.

The complaints in CIV–80–796C, CIV–80–797C, and CIV–80–1184C must be dismissed. The plaintiffs in those cases have not reached age 40. Of course, persons less than 40 years old will necessarily benefit from the result reached in this lawsuit.

Accordingly, in CIV–80–874C, the Clerk shall enter judgment in favor of plaintiffs Koch, Smith, and Walker, and plaintiff-intervenor EEOC. As to all others, the complaints shall be dismissed. The Clerk shall also enter judgments dismissing the complaints in CIV–80–796C, CIV–80–797C, and CIV–80–1184C.

So ordered.